1  JEFFREY E. TSAI (SBN 226081)
   jeff.tsai@dlapiper.com
2  ISABELLE L. ORD (SBN 198224)
   isabelle.ord@dlapiper.com
3  DAVID F. GROSS (SBN 083547)
   david.gross@dlapiper.com
4  ANTHONY L. PORTELLI (SBN 280766)
   anthony.portelli@dlapiper.com
5  DLA PIPER LLP (US)
   555 Mission Street, Suite 2400
6  San Francisco, CA 94105
   Tel:  415.836.2500
7  Fax:  415.836.2501

8  Attorneys for Plaintiffs
   STACKLA, INC., STACKLA LTD., and
9  STACKLA PTY LTD.

10                    UNITED STATES DISTRICT COURT

11                  NORTHERN DISTRICT OF CALIFORNIA

12                      SAN FRANCISCO DIVISION

13

14  STACKLA, INC., a Delaware Corporation,      Case No. 3:19-cv-5849
    STACKLA LTD., an English limited
15  company, and STACKLA PTY LTD., an
    Australian Proprietary Limited Company,     COMPLAINT FOR

16             Plaintiffs,                       1. DECLARATORY JUDGMENT UNDER
                                                    22 U.S.C. § 2201 THAT PLAINTIFFS
17  v.                                              HAVE NOT VIOLATED THE
                                                    COMPUTER FRAUD AND ABUSE ACT
18  FACEBOOK, INC., a Delaware Corporation,         (18 U.S.C. § 1030);
    INSTAGRAM, LLC, a Delaware Limited         2. DECLARATORY JUDGMENT UNDER
19  Liability Company, and DOES 1-20,             22 U.S.C. § 2201 THAT PLAINTIFFS
                                                    HAVE NOT VIOLATED CAL. PENAL
20             Defendants.                          CODE § 502(C);
                                               3. INTENTIONAL INTERFERENCE WITH
21                                                CONTRACT;
                                               4. INTENTIONAL INTERFERENCE WITH
22                                                PROSPECTIVE ECONOMIC|
                                                  ADVANTAGE;
23                                             5. UNFAIR COMPETITION (CAL. BUS. &
                                                  PROF. CODE §  17200, *ET SEQ.*);
24                                             6. PROMISSORY ESTOPPEL;
                                               7. BREACH OF CONTRACT (MSA);
25                                             8. BREACH OF CONTRACT; AND
                                               9. BREACH OF THE IMPLIED COVENANT
26                                                OF GOOD FAITH AND FAIR DEALING

27                                             **DEMAND FOR JURY TRIAL**

28

DLA PIPER LLP (US)
SAN FRANCISCO
                                      1
                        COMPLAINT AND DEMAND FOR JURY TRIAL
WEST\287740140.2

Plaintiffs Stackla, Inc. ("Stackla US"), Stackla Ltd., and Stackla Pty Ltd. ("Stackla Pty"), and (collectively, "Stackla") for their Complaint against Defendants Facebook, Inc. ("Facebook") and Instagram, LLC ("Instagram") (collectively, the "Defendants") allege as follows:

## INTRODUCTION

1.      Stackla brings this action because the conduct of Defendants as alleged herein is destroying Stackla's business and Stackla's survival is now in question.

2.      Defendants are the largest and most influential social media networks on the globe, and they are systematically using their power to pick winners and losers among companies whose business is based on the social interactions of people—the *billions* of people who use Facebook and Instagram to stay connected with each other and the world.  For all intents and purposes, Facebook and Instagram are the epicenter of online social media.  To lose access to Facebook and Instagram is essentially to lose access to social media altogether.  Yet, this is what Defendants have done to Stackla without explanation.  Defendants recognize this virtually monopolistic power they exert over the social media landscape, and they use it to advance their own interests or deflect away from their own missteps—even if it means crushing good-faith actors like Stackla in the marketplace along the way.  If Defendants are allowed to exclude Stackla from Facebook and Instagram, Defendants will crush Stackla.

3.      For content-marketing companies whose business is based on curating user content for their clients' brand marketing campaigns, their business revolves almost exclusively around Facebook and Instagram. Stackla is a market leader among those companies—and, until recently, was an official partner in good standing with Defendants.  Defendants vetted and pre-approved Stackla's enterprise technology platform and application, and Stackla only collects publicly available information on Facebook and Instagram through approved or publicly available endpoints.  Stackla respects the rights of social media users who create content and facilitates a process to help its clients acquire the rights to content so it can be used by its clients for marketing.

4.      Stackla is a good actor in the marketplace, but became a casualty of Defendants' relentless scorched-earth approach to belated reputation protection. In the wake of the Cambridge

1  Analytica scandal and fueled by state and federal law enforcement antitrust investigations, a

2  reinvigorated Federal Trade Commission investigation, and Congressional inquiries, Facebook

3  and Instagram recently have begun purging their platforms of companies, at least as to Stackla,

4  without any rhyme or reason and in violation of their good-faith partnerships and agreements.

5       5.     After a report by BusinessInsider.com, an online popular news organization,

6  questioned Defendants' partnership with online marketing platform companies (including

7  Stackla), Defendants abruptly denied Stackla access to the Facebook and Instagram platforms.

8  Defendants claimed that this action was necessary and justified by Stackla's alleged violation of

9  the federal Computer Fraud and Abuse Act ("CFAA") and the California Comprehensive

10  Computer Data Access and Fraud Act ("CDAFA").  This is pretextual, however.  Stackla strongly

11  denies these allegations and has not violated either the CFAA or CDAFA.  But, Defendants

12  refused to even talk with Stackla before terminating its access to their platforms.  By

13  preemptively denying Stackla's access to the Facebook and Instagram platforms, Defendants also

14  breached their own contractual obligations to provide Stackla with access to the Facebook and

15  Instagram platforms, and failed to provide Stackla with a bona fide opportunity to cure alleged

16  violations under a Master Subscription Agreement with Defendants.

17       6.     Through the parties' contractual agreements, the Defendants gained access to

18  Stackla's proprietary and confidential business information, and know that Stackla's business

19  model and clients require access to the Facebook and Instagram platforms. Each day that

20  Defendants continue to deny Stackla access to the Facebook and Instagram platforms, Defendants

21  are knowingly and irreparably harming Stackla as a going concern.  Defendants are well aware

22  that Stackla cannot deliver promised services to its clients by virtue of the Defendants' denial of

23  access, which will result in the termination of client agreements, loss of new clients, and loss of

24  investor relationships and Stackla's IPO.  The situation will soon reach a tipping point where

25  Stackla will no longer have the ability or means to operate at all.

26       7.     In their whim, Defendants have determined that Stackla should be a company

27  without a product, and should be sacrificed regardless of cost. By cavalierly using their global

28  market dominance to anoint market winners and losers, Defendants have engaged in anti-

competitive behavior and have become unchecked and ungoverned.  As a result, Stackla is being irreparably harmed and legal relief is urgently needed to save Stackla's business from destruction.

### THE PARTIES

8.     Plaintiff Stackla US is a Delaware corporation with its principal place of business in San Francisco, California.

9.     Plaintiff Stackla Ltd. is a limited company incorporated in England with its principal place of business in London, England, United Kingdom.

10.    Plaintiff Stackla Pty is a proprietary limited company incorporated in Australia with its principal place of business in Crows Nest, New South Wales, Australia.  It is the parent company and sole owner of Stackla US and Stackla Ltd. and owns all the intellectual property of Stackla.

11.    Stackla Pty operates Stackla Ltd. and Stackla US to manage the employment of personnel in the various regions where the company operates and for in-region customer contracts. Stackla Pty, Stackla Ltd., and Stackla US each execute client contracts directly in their designated regions:  (a) Stackla executes customer contracts in Asia Pacific; (b) Stackla US executes contracts in North America; and (c) Stackla Ltd. executes contracts in Europe, the Middle East, and Africa. Thus each of the Stackla entities is a party to numerous customer contracts that will be jeopardized by the acts of Defendants as set forth herein.

12.    Defendant Facebook is a Delaware corporation with its principal place of business in Menlo Park, California.

13.    On information and belief, Defendant Instagram is a Delaware limited liability company with its principal place of business in Menlo Park, California and is a wholly owned subsidiary of Facebook.

14.    Defendants comprise the world's largest social network with over 2.4 billion monthly active users.

15.    DOE Defendants are necessary in this action because, on information and belief, other affiliates of Facebook in addition to Instagram may also be proper parties to this action under the definition of "affiliates' used by Facebook, which includes "an entity which, directly or

1   indirectly, owns or controls, is owned or controlled by or is under common ownership or control

2   of Facebook." Facebook has referred to itself in connection with Stackla as Facebook and its

3   "affiliates," including those with offices at 1601 Willow Road, Menlo Park, California, 94025.

4   The identifies of such affiliates is unknown to Stackla at this time.

5       16.    The true names and capacities of the Defendants sued fictitiously as DOES 1-20

6   (the "DOE Defendants"), whether individual, corporate, associate, or otherwise, are presently

7   unknown to Stackla. When the true names and capacities of the DOE Defendants are discovered,

8   Stackla will amend this Complaint accordingly. Stackla is informed and believes, and based

9   thereon, alleges that the fictitiously named DOE Defendants, and each of them, are in some

10   manner liable and responsible for the conduct alleged herein, and are subject to the jurisdiction of

11   this Court for the relief prayed for herein. Facebook, Instagram, and the DOE Defendants are

12   referred to herein collectively as the "Defendants."

13       17.    Stackla is informed and believes, and based thereon, alleges that, at all times

14   herein, each of the Defendants was the agent, employee, partner, joint venturer, co-conspirator,

15   and/or representative of each of the co-Defendants, and in doing the acts herein alleged, was

16   acting within the course and scope of such agency, employment, partnership, joint venture,

17   conspiracy and/or representation.

18   **JURISDICTION, VENUE, AND ASSIGNMENT**

19       18.    The Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331

20   because Plaintiffs' first claim for relief seeks declaratory judgment under 28 U.S.C. §§ 2201 and

21   2202 that Plaintiffs have not violated the Computer Fraud and Abuse Act, 18 U.S.C. § 1030

22   ("CFAA").

23       19.    Under 28 U.S.C. § 1367, the Court has supplemental jurisdiction over Plaintiffs'

24   second through ninth claims for relief because they arise out of the same common set of facts and

25   conduct as Plaintiffs' federal claim for relief.

26       20.    This Court has personal jurisdiction over Defendants in this action because the

27   corporate headquarters and principal place of business for both Defendants is within this judicial

28   district, and Defendants have engaged and continue to engage in substantial business within this

judicial district.

21.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(1) and (2) because Defendants conduct substantial business within this judicial district and a substantial part of the acts or omissions giving rise to Plaintiffs' claims occurred in this judicial district.

**FACTUAL ALLEGATIONS**

**The Stackla Companies**

22.     Stackla was formed to provide marketing strategies to clients, and to build and operate a product that leverages public content available on social media for marketing purposes. Stackla offers an innovative and market leading enterprise platform for marketers to search for positive public content posted on social media about their brands, products, or services by satisfied customers and to display these endorsements through their own marketing.  Stackla counts many of the world's most recognizable brands among its customers.

23.     Stackla is also a software-as-a-service (SaaS) business. Stackla sells annual cloud software subscriptions to clients. Stackla clients include large companies like Facebook and mid-market/enterprise business-to customer brands.

**Stackla's Business Depends on the Use of Facebook and Instagram**

24.     Stackla's business is predicated on access to publicly available information on social media platforms, especially Facebook and Instagram, from which Stackla and its customers obtain the vast majority of the content that forms Stackla's business.

25.     Stackla's platform enables its customers to query Facebook, Instagram, and other social media platforms to discover the most compelling public content that is being produced by consumers about the brands of Stackla's customers.  Once this content is identified by Stackla's customers, Stackla curates the selected content by applying metadata, sorting the content, and staging the content for review by the client.

26.     The content is created by Facebook or Instagram users who publish the content in a publicly available forum on Defendants' platforms.  Stackla facilitates the consent process to enable its customers to legitimately acquire the rights to the publicly available content from the content creators based on negotiated terms of use.  Only after usage rights are explicitly granted

and terms of use are agreed to by the content creator, can Stackla's customers store the original content.  This facilitated process ensures that Stackla's customers use rights-approved content in their own marketing and brand advertising campaigns across the web, in social media posts, digital advertising, e-commerce, and live event screen/billboard advertising.

27.     Stackla's customers access public content on Facebook and Instagram through publicly available methods that have been created or vetted by Defendants.  Pursuant to the approval of Defendants, Stackla collects content on behalf of customers via an interface Facebook created to permit third party developer access to content on Facebook and Instagram known as Facebook's Open Graph Application Programing Interface ("API").  All content collected through the API is publicly available and sourced via approved or publicly available endpoints from Facebook and Instagram.

28.     Both Facebook and Instagram allow individual users to publish content to their pages where it is visible to anyone who wishes to view the content.  The Terms of Service for Facebook and the Terms of Use for Instagram both specify that the content created by a user on the platforms is owned by the user but the user grants the platform a non-exclusive license to the content.  For example, the Instagram Terms of Use specifically state: "Permissions You Give to Us. As part of our agreement, you also give us permissions that we need to provide the Service. We do not claim ownership of your content, but you grant us a license to use it."

**The Master Subscription Agreement**

29.     In June 2018, Stackla, Inc. entered into a Master Subscription Agreement (the "MSA") under which Defendants purchased a subscription to software-as-a-service products and related services from Stackla.  Pursuant to the MSA, Defendants granted Stackla access to certain of Defendants' systems and data.  Stackla has never collected or used data obtained under the MSA for any purpose other than in connection with the services provided under the MSA.

**Stackla Becomes An Official Facebook Marketing Partner**

30.     Defendants offer businesses the opportunity to become official Facebook Marketing Partners.  In April 2018, Stackla applied to become an official Facebook Marketing Partner.  The Facebook Marketing Program is "a global community of specialists known for their

excellent service and technical skill.  The program offers client matches and gives access to

resources that can help fuel the growth of your business."

https://www.facebook.com/business/marketing-partners/become-a-partner.

31.     On May 25, 2019, Stackla received confirmation that it had been accepted into the Facebook Marketing Partner program and was listed on the Facebook Marketing Partner site as an official partner of Facebook.

32.     As a Facebook Marketing Partner, Stackla was awarded a Facebook Marketing Badge, which is given only to companies "who meet the highest standards of performance and service. If you've got a badge, it tells everyone you're among the best at what you do."  *Id.*

33.     All Facebook Marketing Partners are "supported by Facebook, vetted for excellence in their industries, and highly skilled on our platforms." *Id.*

34.     The process of becoming an official Facebook Marketing Partner took more than a year and involved extensive review and vetting of Stackla's business model and platform by Defendants, including review of Stackla's business and clients, confirmation of sufficient usage of Facebook and Instagram by Stackla's clients, demonstrations of the Stackla platform, and multiple in-application reviews of Stackla's application.  The most recent in-application review occurred in May 2019 just before Stackla was accepted as a Facebook Marketing Partner.

35.     In addition to Defendants' review of Stackla in connection with the FMP program, Stackla also participated in a Request for Proposals process by Oculus, a virtual reality technology company that Facebook owns.  Stackla won the RFP process, and it passed the exhaustive Oculus/Facebook internal Infosec process, further validating the compliant and robust nature of Stackla's platform and Facebook's approval of it in early 2018.

36.     At no time during the review and on-boarding of Stackla as a Facebook Marketing Partner or any of the other business interactions between Stackla and Defendants did Defendants raise any objection to Stackla's business practices, Stackla's application or its use of the API, or Stackla's interactions with Facebook or Instagram.

**Fallout from the Cambridge Analytica Scandal**

37.     In 2010, Facebook launched the API Open Graph for third party applications that

allowed external developers to connect with Facebook's users and to request permission to access their personal data.  At the time, it also allowed access to the personal data of the Facebook users' friends.

38.     In 2014, Facebook announced that it would change its platform to limit the data third party apps could access, including requiring developers to get approval from Facebook before they could request sensitive data.  This change, at least in part, was intended to require third party apps to get consent from users' friends before accessing their personal data on Facebook.

39.     In 2015, *The Guardian* revealed a massive misappropriation of Facebook users' personal information from the Facebook platform by an application developer, which ended up in the hands of Cambridge Analytica, a British political consulting firm.  According to Facebook, an app developer used Facebook to collect personal information from Facebook users and their Facebook friends.  Ultimately the personal data of millions of Facebook users was collected and then shared by the app developer with Cambridge Analytica.  In response, Facebook denied the app developer access to the Facebook platform and demanded that Cambridge Analytica to delete the user information.  This was the beginning of Facebook's Cambridge Analytica scandal.  *See* https://www.cbsnews.com/news/facebook-data-cambridge-analytica-mark-zuckerberg-ceo-statement-today-2018-03-30/

40.     In March 2018, *The Guardian* and the *New York Times,* among others, reported in an explosive story that more than 50 million Facebook users' profiles were harvested for Cambridge Analytica.  Later in March 2018, the Federal Trade Commission opened an investigation into whether Facebook had violated a prior settlement with the FTC relating to Facebook user protections.  Facebook ultimately settled with the FTC in 2019 for a record-breaking $5 billion dollar fine. https://newsroom.fb.com/news/2019/07/ftc-agreement/

41.     In this second phase of the Cambridge Analytica scandal, Facebook faced even greater scrutiny of its privacy practices.  In 2018, Mark Zuckerberg laid out Facebook's response. "First, we will investigate all apps that had access to large amounts of information before we changed our platform to dramatically reduce data access in 2014, and we will conduct a full audit

1  of any app with suspicious activity. We will ban any developer from our platform that does not

2  agree to a thorough audit. And if we find developers that misused personally identifiable

3  information, we will ban them and tell everyone affected by those apps. . . ."  "Second, we will

4  restrict developers' data access even further to prevent other kinds of abuse. . . ."

5  https://www.cbsnews.com/news/facebook-data-cambridge-analytica-mark-zuckerberg-ceo-

6  statement-today-2018-03-30/.

7      42.    The  reforms announced by Mark Zuckerberg in response to the Cambridge

8  Analytica scandal pre-date Facebook's approval of Stackla as an official Facebook Marketing

9  Partner in May 2019 by more than a year.  Facebook's new and more restrictive policies were in

10  place during Defendants' review of Stackla's business model and application before Stackla was

11  approved as a FMP.

12  **The August 2019 Business Insider Articles**

13      43.    In August 2019, Business Insider published an article asserting that Instagram

14  suffered from configuration errors and lax privacy practices that allowed an advertising partner to

15  scrape and aggregate user location data and other information from Instagram users on the

16  Instagram platform.  https://www.businessinsider.com/startup-hyp3r-saving-instagram-users-

17  stories-tracking-locations-2019-8

18      44.    This article drew unwanted attention to Instagram because, although Facebook is

19  undergoing very public scrutiny of its privacy practices, to some extent Facebook had managed to

20  steer the scrutiny away from Instagram even though it is a wholly owned subsidiary of Facebook

21  and integrated into the Facebook platform.  Now, suddenly BusinessInsider.com had placed

22  Instagram squarely in the midst of Facebook's privacy challenges.  Business Insider called this

23  "Instagram's Cambridge Analytica moment."  https://www.businessinsider.com/trending-

24  instagram-cambridge-analytica-moment-2019-8  On information and belief, the threat to

25  Instagram is all the more substantial because Facebook conceals the extent of its control over and

26  integration with Instagram, including the data sharing between Defendants such that Facebook's

27  privacy challenges also permeate Instagram.

28      45.    Also in August 2019, Business Insider published a second article reporting that it

1  had identified other companies through their websites and other publicly available information

2  that were also allegedly scraping user data on Instagram.  Among other companies named in the

3  article, BusinessInsider.com contended that older statements on Stackla's website suggested that

4  it could acquire location data from Instagram. https://www.businessinsider.com/facebook-review-

5  all-marketing-partners-instagram-data-scraping-2019-8

6       46.    Stackla's Chief Executive Officer issued a strong denial of the allegations,

7  confirming that the article was not accurate because Stackla does not scrape data from Instagram

8  or Facebook and only collects information through publicly available APIs provided by

9  Defendants.

10       47.    Stackla's ability to use Facebook and Instagram is vital to its business. Despite

11  Stackla's public denial in the BusinessInsider.com article and Facebook's very recent vetting of

12  Stackla as a Facebook Marketing Partner, Stackla wished to confirm to Defendants directly that

13  the information in the article was not correct.

14       48.    Stackla made multiple attempts to contact Defendants, including: (i) August 22,

15  23, and 28, 2019 emails and an August 23, 2019 LinkedIn message to Instagram's Head of

16  Communications, Elisabeth Diana, and (ii) an August 22, 2019 email to Sim Singh, Facebook

17  Ecosystem Development, Creative Platform, Global Marketing Solutions and Gurbinder Ghotra,

18  Facebook Global Marketing Solutions Specialist.  Sim Singh and Gurbinder Ghotra are Stackla's

19  contacts at Facebook who had assisted Stackla during the vetting process to become a Facebook

20  Marketing Partner and are familiar with Stackla's business model and its application.  Stackla

21  received no response to any of these communications to Defendants.

22  **The August 30, 2019 Cease-and-Desist Letter**

23       49.    On August 30, 2019, Stackla received a "Cease and Desist Abuse of Facebook"

24  letter via email to its Chief Executive Officer, Chief Product Officer, and Chief Operating

25  Officer/Chief Financial Officer at Stackla's San Francisco offices (the "Cease-and-Desist

26  Letter.")

27       50.    The Cease-and-Desist letter accused Stackla of violating (i) state and federal laws,

28  including the Computer Fraud And Abuse Act, 18 U.S.C. § 1030 and the California

DLA Piper LLP (US)
San Francisco

11

COMPLAINT AND DEMAND FOR JURY TRIAL

1    Comprehensive Computer Data Access and Fraud Act, California Penal Code § 502(c), (ii)

2    Instagram's Terms of Use and Platform Policy, and (iii) Facebook's Terms of Service and

3    Platform Policy.  The letter also asserted that Stackla, Inc. had breached the MSA, and

4    threatening that the Cease-and-Desist Letter should not be ignored.

5         51.    The Cease-and-Desist Letter also informed Stackla that (i) Facebook had revoked

6    its licenses and the personal licenses of individual officers of Stackla, (ii) Stackla and its agents,

7    employees, and anyone else action on behalf of Stackla are prohibited from accessing Facebook

8    or Instagram, including the use of APIs or any Facebook services for any reason whatsoever, (iii)

9    Facebook had taken technical measures to terminate access, (iv) Defendants "will consider further

10   activity by You on its websites or services as unauthorized access to its protected computer

11   networks," and (v) Stackla's status as a Facebook Marketing Partner had been suspended.

12        52.    That same day, Defendants cut off Stackla's access to Facebook and Instagram,

13   disabling Stackla's previously approved application and its ability to do business based on

14   Defendants' platforms.  The personal Facebook and Instagram accounts of Stackla's officers were

15   also cut-off without notice.

16        53.    In fact, Defendants went much further than the punitive measures identified in the

17   Cease-and-Desist Letter.  Defendants also suspended the personal Facebook and Instagram

18   accounts of Stackla employees *and former employees* and barred their access to Facebook and

19   Instagram without notice or any legitimate basis for doing so.

20        54.    The Cease-and-Desist Letter also made a series of impossible demands to Stackla

21   that are tantamount to asking Stackla to destroy its entire business.  These demands to Stackla

22   include (i) stop accessing and do not in the future access Facebook or Instagram and not use

23   Defendants' services for any reason, (ii) stop and do not in the future collect, offer, or market any

24   data or services relating to Defendants or any of their affiliates, (iii) remove all references to

25   Defendants and their affiliates from website and marketing materials, (iv), delete all data

26   collected from Defendants and the technical means by which the data was collected, (v) request

27   the return or destruction of any material from Facebook or Instagram that shared with any third

28   parties, (vi) provide logs or screenshots confirming the deletions, and (vii) account for and

disgorge all Stackla revenue relating thereto.  Defendants also demanded that Stackla provide its confidential and proprietary technical information and methods allegedly used to improperly obtain data from Defendants, including Stackla's software code.

55.     Stackla was shocked to receive the Cease-and-Desist Letter, especially after its recent vetting as a Facebook Marketing Partner, its public denial in the BusinessInsider.com article, and its multiple communications to Defendants thereafter.  Stackla was also shocked that its access to Facebook and Instagram was cut off that same day, immediately crippling its business.

56.     Stackla immediately retained counsel and responded to the Cease-and-Desist Letter, expressing its confusion at the accusations, offering to verify its business practices, and explaining that cutting Stackla off from Facebook and Instagram would effectively destroy Stackla's business.  In response, Defendants doubled down on their accusations, refusing to provide anything more than the most general information as to the purported basis for Defendants' accusations and draconian actions despite the effects on Stackla's business.

**Defendants' Conduct is Causing Stackla Irreparable Harm**

57.     Through Defendants' Facebook  Marketing Partner due diligence and their other business relationships with Stackla, Defendants have knowledge of Stackla's valid customer contracts and business model.  Stackla also informed Facebook of its base of clients during Defendants' review of Stackla's business, ensuring such knowledge.  As Defendants' know, Facebook and Instagram user content comprises over 80 percent of the content curated by Stackla's clients through Stackla's platform.

58.     Stackla has now been completely cut off from Facebook and Instagram and cannot deliver contractually promised services to its clients.  Stackla will be forced to terminate its client agreements if Stackla's clients do not cancel the agreements first.

59.     Stackla relies on receivables from its clients to fund its operations, which are dependent on customers using the Stackla platform to source and acquire content.  Access to Facebook and Instagram content is central to and a business "critical capability for Stackla.  Without continued access to Facebook and Instagram, Stackla will be deprived of its revenue.

60.     Stackla's clients have begun asking what recourse they have to cancel contracts and receive refunds for license fees.  A majority of Stackla's customers have already raised their concerns regarding lack of access and Stackla's breach, and if not cured, Stackla's customer contracts will be terminated.  Prospective clients are now questioning their decision to select Stackla and instead choosing its competitors.  Stackla's competitors are aggressively prospecting Stackla's clients, claiming that Defendants' revocation of Stackla's access suggests that Stackla is a bad actor in the industry and the clients should switch to the competitor's offering.  Stackla is losing business every day that access to Facebook and Instagram is shut off, and this will soon reach a tipping point where Stackla can no longer operate.

61.     Facebook remains battered by the Cambridge Analytica scandal, continuing Congressional investigations and other regulatory scrutiny of its privacy practice.  For this reason, Stackla is informed and believes and thereon alleges that Defendants reacted to the BusinessInsider.com article by summarily jettisoning Stackla, a vetted Facebook Marketing Partner, without heeding Stackla's denials or giving Stackla a chance to refute the accusations. On information and belief, to protect Instagram from being drawn into Facebook's privacy challenges, Defendants have chosen to cut Stackla off, ignoring their own recent due diligence and approval of Stackla as a Facebook Marketing Partner, Stackla's communications with Defendants, its public denial of the allegations, and the resulting destruction of Stackla's business.

62.     The effects of Defendants' conduct on Stackla were immediate.  In early September 2019, media sources began reporting that Stackla's business was in jeopardy and that Stackla's anticipated initial public offering in Australia is now in limbo.  Defendants' conduct has crippled and will destroy Stackla's business and its ability to raise investor funds or to make its IPO.  Stackla's ability to continue as a viable business is now in question, and if relief is not granted, Stackla will be insolvent.

### FIRST CLAIM FOR RELIEF
**Declaratory Judgment that Stackla Has Not Violated and Will Not Violate
the Computer Fraud And Abuse Act, 18 U.S.C. § 1030
(Against All Defendants)**

63.     Stackla hereby incorporates by reference the allegations of the preceding paragraphs as though fully set forth herein.

64.     Under the Declaratory Judgment Act, courts may "declare the rights and other legal relations" of the parties to "a case of actual controversy." 28 U.S.C. § 2201.

65.     An actual controversy exists between Stackla and Defendants.  Defendants, through the Cease-and-Desist Letter and threats of litigation, are attempting to use the law for an improper and anti-competitive purpose and to give themselves a competitive advantage.  The Cease-and-Desist Letter alleges that continued access by Stackla to Facebook or Instagram may violate the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 ("CFAA").  Defendants have also threatened Stackla with litigation if Stackla does not stop accessing Defendants' websites but complying with these demands would destroy Stackla's business.  Defendants have already threatened and harmed Stackla's business by cutting off access to Facebook and Instagram, preventing Stackla from accessing Defendants' websites and applications, employing their APIs, or using any of Defendants' services whatsoever.  These measures are intended to block Stackla from both Facebook and Instagram.  Thus, Stackla has a real and reasonable apprehension that Stackla will be subject to liability by Defendants if it continues to access Facebook or Instagram. This apprehension is caused by Defendants' actions, including the Cease-and-Desist Letter and Defendants' use of technical measures to terminate Stackla's access.

66.     Stackla seeks a judicial declaration that it has not and will not be in violation of the CFAA (i) if it continues to access Facebook or Instagram through public channels; and that (ii) Defendants cannot use CFAA for an improper purpose in a way that leads to independent violations of California law and infringes on Stackla's rights.

67.     Stackla prays for relief as set forth below.

**SECOND CLAIM FOR RELIEF**
**Declaratory Judgment that Stackla Has Not and Will Not Violate the California Comprehensive Computer Data Access and Fraud Act, California Penal Code § 502(c) (Against All Defendants)**

68.     Stackla hereby incorporates by reference the allegations of the preceding paragraphs as though fully set forth herein.

69.     An actual controversy exists between Stackla and Defendants.  Defendants, through the Cease-and-Desist Letter and threats of litigation, are attempting to use the law for an improper and anti-competitive purpose and to give themselves a competitive advantage.  The Cease-and-Desist Letter alleges that continued access by Stackla to Facebook or Instagram may violate the California Comprehensive Computer Data Access and Fraud Act ("CDAFA"), promulgated at California Penal Code § 502(c).  Defendants have also threatened Stackla with litigation if Stackla does not stop accessing Defendants' websites but complying with these demands would destroy Stackla's business.  Defendants have already threatened and harmed Stackla's business by cutting off access to Facebook and Instagram, preventing Stackla from accessing Defendants' websites and applications, employing their APIs, or using any of Defendants' services whatsoever.  These measures are intended to block Stackla from both Facebook and Instagram.  Thus, Stackla has a real and reasonable apprehension that Stackla will be subject to liability by Defendants if it continues to access Facebook or Instagram.  This apprehension is caused by Defendants' actions, including the Cease-and-Desist letter and Defendants' use of technical measures to terminate Stackla's access.

70.     Stackla seeks a judicial declaration that it has not and will not be in violation of California Penal Code § 502(c) (i) if it continues to access Facebook or Instagram through public channels; and that (ii) Defendants cannot use California Penal Code § 502(c) for an improper purpose in a way that leads to independent violations of California law and infringes on Stackla's rights.

71.     Stackla prays for relief as set forth below.

COMPLAINT AND DEMAND FOR JURY TRIAL

DLA PIPER LLP (US)
SAN FRANCISCO

WEST\287740140.2

**CLAIM FOR RELIEF THREE**
**Intentional Interference with Contract**
**(Against All Defendants)**

72.     Stackla hereby incorporates by reference the allegations of the preceding paragraphs as though fully set forth herein.

73.     Stackla has valid contracts with each of its approximately 280 clients, which are entered into respectively by Stackla US in North America, Stackla Ltd in Europe, the Middle East, and Africa, and Stackla Pty in Asia-Pacific.

74.     Defendants have and had knowledge of Stackla's valid customer contracts, and Stackla has informed Defendants of its base of customers.  In fact, Defendants reviewed Stackla's app and business model in connection with approval of Stackla as a Facebook Marketing Partner. These customer contracts are endangered by Defendants' conduct.

75.     Defendants were aware of the harm to Stackla that would result from denying Stackla access to Facebook and Instagram but chose to proceed anyway with cutting Stackla off. Since receiving the Cease-and-Desist Letter, Stackla has given notice to Defendants that its customer relationships and business would be destroyed if Stackla's access to Facebook and Instagram is denied.

76.     Defendants' conduct will disrupt or cause the breach of Stackla's customer contracts.  Stackla's entire business is premised on access to public content on social media, the vast majority of which comes from Facebook and Instagram through the approved Facebook API. Preventing Stackla from accessing Facebook and Instagram will necessarily mean that Stackla cannot continue to perform under its contracts with its clients.

77.     As a direct and proximate result of Defendants' conduct, Stackla has suffered and will continue to suffer damages, including but not limited to lost business, reputational damage, loss of investor funds and its prospective IPO, and insolvency.  Unless Defendants are restrained by a preliminary injunction and a permanent injunction, Stackla will suffer severe and irreparable harm in that it will be forced to terminate its contracts with its clients and may be forced out of business entirely.

78.     Stackla has requested that it be reinstated, that it be allowed to provide explanatory information, and that access should be permitted during that process to avoid irreparable harm to Stackla.  As of September 16, 2019, Defendants' counsel stated, " In view of the overall posture, Facebook is not in a position now to reinstate accounts."  Stackla is informed and believes and thereon alleges that, unless the court grants injunctive relief, Defendants will continue to bar Stackla from Facebook and Instagram.

79.     Stackla has no adequate remedy at law because monetary damages will not afford adequate relief for the loss of Stackla's business and customer relationships, client goodwill, reputation in the marketplace, investor relationships and IPO, and the ability to continue operating.

80.     Stackla prays for relief as set forth below.

**CLAIM FOR RELIEF FOUR**
**Intentional Interference with Prospective Economic Advantage**
**(Against All Defendants)**

81.     Stackla hereby incorporates by reference the allegations of the preceding paragraphs as though fully set forth herein.

82.     As alleged herein, Defendants have intentionally interfered with Stackla's customer contracts and investor opportunities and Stackla's IPO.

83.     Defendants committed independent wrongs when they revoked access to Facebook and Instagram because:  (i) Defendants breached their express promises in their terms of use that their users control access to their information; (ii) Defendants hold only non-exclusive licenses to their users' content, and visitors and the public may access and use their users' publicly available information; and (iii) Defendants violated the California Unfair Competition Law as alleged herein.  Defendants are intentionally and wrongfully disrupting Stackla's contracts, investor relationships, and initial public offering, and prospective business dealings by barring access to Facebook and Instagram, upon which Stackla's business depends.

84.     As a direct and proximate result of Defendants' conduct, Stackla has suffered and will continue to suffer damages, including but not limited to lost business, reputational damage,

1    loss of investor funds and its IPO, and insolvency.

2         85.    Unless Defendants are restrained by a preliminary injunction and a permanent

3    injunction, Stackla will suffer severe and irreparable harm in that it will be forced to terminate its

4    contracts with its clients, lay off its employees, and force it out of business entirely.  Stackla has

5    requested that it be reinstated, that it be allowed to provide explanatory information, and that

6    access should be permitted during that process to avoid irreparable harm to Stackla.  As of

7    September 16, 2019, Defendants' counsel stated, " In view of the overall posture, Facebook is not

8    in a position now to reinstate accounts." Stackla is informed and believes, and based thereon

9    alleges that, unless the court grants injunctive relief, Defendants will continue to bar Stackla from

10   Facebook and Instagram.

11        86.    Stackla has no adequate remedy at law because monetary damages will not afford

12   adequate relief for the loss of Stackla's business and customer relationships, client goodwill,

13   reputation in the marketplace, investor relationships and IPO, and the ability to continue

14   operating.

15        87.    Stackla prays for relief as set forth below.

16   ## CLAIM FOR RELIEF FIVE
17   **Unfair Competition Violations of California Business & Professions Code § 17200, *et seq.***
     **(Unlawful, Unfair, and Fraudulent Prongs)**
18   **(Against All Defendants)**

19        88.    Stackla hereby incorporates by reference the allegations of the preceding

20   paragraphs as though fully set forth herein.

21        89.    Stackla has standing to seek relief under the California Unfair Competition Law,

22   Business & Professions Code § 17200, *et seq*. (the "UCL") because absent injunctive relief,

23   Stackla will suffer a loss of money or property and an economic injury in fact, specifically being

24   forced to terminate its customer contracts, lay off its employees, loss of its IPO, and insolvency.

25        90.    Defendants' termination of access to Facebook and Instagram violates the policy

26   or spirit of antitrust law.  Defendants are using their dominant presence as the world's largest

27   social media platform to assume exclusive proprietary control over public data that is not owned

28   by Defendants, but by their users, and which those users have explicitly designated as public

content.  Indeed, Defendants promise users that they will have the ability to control public access to their data to incentivize users to join Facebook or Instagram.  Defendants' recent and threatened actions thus suppress competition and violate the core principles and spirit of the unfair competition and antitrust laws.

91.   Antitrust law has long recognized the "essential facilities" doctrine, which precluded a monopolist or attempted monopolist from denying access to a facility it controls that is essential to competitors.  Such anti-competitive behavior threatens the extension of the monopolist's control from one stage of production to another, or from one market to another.

92.   Stackla allows brands to facilitate relationships with content creators on Facebook and Instagram, including capturing usage rights and publishing within paid advertisements on both Defendants' platforms and other platforms. Among other paid advertising offered by Defendants, Defendants have technology which allows brands to "sponsor" content creators posts.  Instagram sponsored posts (which are sometimes used to refer to "promoted" posts) are organic posts produced by users on-platform that brands can then pay to promote.  Moreover, Instagram promotes targeted advertising capabilities that allow brands to reach users based on (i) location,( ii) demographic, (iii) interests, (iv) behaviors, (v) customer audiences, (vi) look-alike audiences, and (vii) automated targeting.  By revoking or limiting Stackla's access to publicly available data, Defendants are unfairly limiting Stackla's ability to compete with Defendants advertising offerings and with Stackla's industry competitors who also rely on content from Facebook and Instagram. *See* https://business.instagram.com/advertising.

93.   The publicly posted content of Defendants' users is an essential facility because there is no viable alternative to Defendants' social media platforms for obtaining current content for marketing and advertising purposes.  Defendants are the world's largest social network with over 2.4 billion monthly active users.  Use of other social media platforms with available public user content is not a reality given Defendants' total domination of the market.

94.   There is no technical barrier or subsequent cost to Defendants in providing access. Until recently, Defendants provided pre-approved access to Stackla without burden or complaint. Stackla seeks non-discriminatory access that others, including its industry competitors, already

COMPLAINT AND DEMAND FOR JURY TRIAL

enjoy.

95.     The impact of Defendants' actions on Stackla is devastating; its customer contracts, investor and employee relationships, and its planned IPO are threatened and may be damaged beyond repair.  Defendants' purported justification – allegations in an article that Stackla strongly refuted—are pre-textual as Stackla is a vetted FMP.  All content collected through the API is publicly available and sourced via approved or publicly available endpoints from Facebook and Instagram.  Defendants allow competitors of Stackla and others to access this content without complaint, and Defendants have never even hinted at any concrete harm that Stackla's access in this manner could cause to Defendants or their users.  Instead, Defendants simply want to lock down access to public data in which they have no ownership right to create proprietary control over that data where none could otherwise exist.

96.     As set forth herein, Defendants actions are violations of the UCL's unfair prong.

97.     Defendants' actions are also violations of the unlawful prong of the UCL. Defendants' tortious interference with Stackla's current and prospective business, contractual, and investor relationships and IPO, and Defendants' breaches of promises and agreements, as alleged herein, all give rise to claims under the UCL's unlawful prong.

98.     Defendants' actions also establish a claim for violations of the fraudulent prong of the UCL for two reasons:

First, Defendants made clear promises to their users in their terms of use that the users own their content, control their privacy settings, and that Defendants hold only non-exclusive licenses to the content; and

Second, Defendants developed and operate the Facebook API to allow third party apps to access public content of Defendants' users and vetted Stackla's business model and application through the FMP program, including requiring Stackla to demonstrate that its clients spend significant advertising revenue on Facebook and Instagram.  Defendants made clear promises to Stackla and other third party application developers and FMPs that they would have access to users' public content through the API and could acquire the rights to user content.

99.     These statements are likely to deceive the public, as Defendants are actually

controlling who can access user content and whether the information will be public.

100.     As a direct and proximate result of Defendants' conduct, Stackla has suffered and will continue to suffer the loss of money and property, including but not limited to lost business, lost investments and loss of its IPO, and potential insolvency.  Unless Defendants are restrained by a preliminary and permanent injunction, Stackla will suffer severe, irreparable harm in that it will be forced to terminate its client contracts, lay off its employees, abandon its IPO, and may be forced out of business entirely.  As of September 16, 2019, Defendants have refused to reinstate Stackla's access and Stackla is informed and believes and thereon alleges that, unless this court grants injunctive relief, Defendants will continue to entirely bar Stackla.

101.     Stackla has no adequate remedy at law because monetary damages will not afford adequate relief for the loss of Stackla's customer and investor relationships, business goodwill, Stackla's IPO, and the ability to continue operating as a viable business.

102.     Stackla prays for relief as set forth below.

## CLAIM FOR RELIEF SIX
### Promissory Estoppel
### (Against All Defendants)

103.     Stackla hereby incorporates by reference the allegations of the preceding paragraphs as though fully set forth herein.

104.     As alleged herein, Defendants made clear promises to their users in their terms of use or service that the users own their content, control their privacy settings, and that Defendants hold only non-exclusive licenses to the content.

105.     Defendants also made clear promises to Stackla and other third party application developers and FMPs that they would have access to users' public content through the API and could acquire the rights to user content.  In fact, Defendants developed and operate the Facebook API to allow third party apps to access public content of Defendants' users and vetted Stackla's business model and application through the Facebook Marketing Partner program and other business relationships.

106.     Defendants' course of dealing with Stackla reasonably led Stackla to believe that

Defendants would allow continued access to their platforms and user content and thus created an enforceable promise to Stackla. Defendants were fully aware of Stackla's application, business model, and dependence on access to Defendants' platforms because Defendants reviewed Stackla's application and business model for over a year and approved Stackla as a Facebook Marketing Partner in May 2019.

107.  Defendants also invited Stackla to their industry conferences and assigned a team to Stackla for the Facebook Marketing Partner program review and on-boarding. This process included a discussion of Stackla's business operations, client contracts, investments and initial public offering ambitions, and the essential value of Defendants' public user content to Stackla. In fact, Stackla was required to demonstrate that its clients have a sufficient volume of use on Facebook and Instagram. Stackla also underwent a prior evaluation and approval in 2018 relating to Facebook's affiliate, Oculus.

108.  During this time, Defendants never raised any objections to Stackla's application or business model, and instead approved Stackla as an official Facebook Marketing Partner and awarded Stackla a Facebook Marketing Badge. This course of conduct led Stackla to believe that Defendants had no complaints about Stackla's access to public content on their platforms, Stackla's application and use of the API, or Stackla's business model, as Defendants had officially approved Stackla as a Facebook Marketing Partner. Defendants are now bound by their promises and it is within the Court's equitable powers to hold Defendants to their promises under the circumstances.

109.  Stackla reasonably relied on Defendants' promises and such reliance was both foreseeable and known to Defendants. Stackla developed and built a content curation and marketing technology company based on the premise that Defendants' public content would remain open to the public. Other businesses have been built on a similar model, including Stackla industry competitors like Spinklr, Khorus, Olapic, Curalate, Pixlee, Crowdriff, BazaarVoice, and certain products within Salesforce and Oracle. In fact, Defendants developed and offered their API to allow third party application developers to access public content on their platforms in 2010 and have offered the API since then to third party application developers like Stackla. Further,

Defendants reviewed Stackla's application and business model and approved Stackla as a FMP knowing that Stackla's business is almost entirely predicated on its ability to access content on Defendants' platforms.

110. Stackla's reliance was to its substantial detriment. Based on Defendants' promises and conduct, Stackla spent millions of dollars developing its technology, building its business, forming client and investor relationships, and expanding across Asia Pacific, North America, and Europe. Stackla also invested in the Facebook Marketing Partner program process, including working with Defendants' Facebook Marketing Partner team to become a Facebook Marketing Partner, attending Defendants' industry conferences, and allowing Defendants to review Stackla's application, business model, and customer relationships repeatedly and extensively. Stackla now has operations, employees, and customers in all of these regions around the world and is preparing for an initial public offering. All of this was predicated on access to Defendants' platforms and will be lost if Defendants are permitted to go back on their promises and to bar Stackla.

111. As a direct and proximate result of Defendants' conduct, Stackla has suffered and will continue to suffer damages, including but not limited to lost business, lost investors, loss of its IPO, and insolvency. Unless Stackla is granted a preliminary injunction and a permanent injunction, Stackla will suffer severe, irreparable harm in that it will be forced to terminate its contracts with clients, lay off its employees, lose its investor relationships, lose its IPO, and become insolvent. As recently as September 16, 2019, Defendants refused to reinstate Stackla, and Stackla is informed and believes and thereon alleges that unless this court grants injunctive relief, Defendants will continue to bar Stackla from their platforms.

112. Stackla has no adequate remedy at law because monetary damages alone will not afford adequate relief to Stackla for the loss of its client and investor relationships, IPO, business goodwill, and the ability to continue operating.

113. Stackla prays for relief as set forth below.

**CLAIM FOR RELIEF SEVEN**
**Breach of Contract-MSA**
**(Stackla US against All Defendants)**

114.     Stackla hereby incorporates by reference the allegations of the preceding paragraphs as though fully set forth herein.

115.     On or about June 1, 2018, Plaintiff Stackla US entered into a Master Subscription Agreement with Defendants for purchase of a subscription to software-as-a-service products and retained services from Stackla US (the "MSA").

116.     Stackla US is informed and believes and thereon alleges that Defendant Instagram is a party to the MSA because the MSA provides that affiliates of Facebook with offices at 1601 Willow Road, Menlo Park, California, 94025 are also parties to the MSA and this is Instagram's business address.  Further, as provided in the MSA, Instagram is an affiliate of Facebook because it is an entity owned and controlled by Facebook.

117.     Stackla US has performed all obligations required of Stackla US under the MSA.

118.     Section 7.2 of the MSA provides that a party may terminate the agreement only if "the other party fails to cure any material breach of this Agreement within thirty (30) days after written notice of such breach."  Defendants have not provided valid or timely notice of any breach by Stackla US.

119.     The MSA obligates Defendants to provide Stackla US access to Defendants' systems to facilitate the business relationships that are the subject of the MSA.  By denying Stackla's access to Defendants' platforms, Defendants are in breach of their obligations under the MSA, and have not cured such breach.

120.     Stackla has demanded and hereby demands reinstatement to Defendants' platforms and performance by Defendants of their obligations under the MSA.

121.     Stackla US has been damaged by Defendants' breaches in an amount to be proven at trial, plus interest thereon.

122.     Stackla US prays for relief as set forth below.

## CLAIM FOR RELIEF EIGHT
### Breach of Contract
### (Against All Defendants)

123.    Stackla hereby incorporates by reference the allegations of the preceding paragraphs as though fully set forth herein.

124.    Defendants offer the API, which was designed to provide third party application developers with access to Defendants' platforms and user content.  Defendants approved Stackla's use of the API for business purposes and Facebook provides the token security credentials for Stackla's customers to access Defendants' platforms.

125.    Defendants offered the FMP program to Stackla.  In May 2018, Stackla applied to become a FMP, and after a year of due diligence and multiple in-application reviews of Stackla's application and business model, Stackla was approved as an FMP and awarded the Facebook Marketing Badge. Through this process, Defendants became familiar with Stackla's business and customer relationships and were aware that Stackla's business depends on access to Defendants' platforms.  By this process and through Stackla's designation as an FMP, Defendants agreed to provide Stackla access to their platforms for business purposes.

126.    Defendants agreed to allow Stackla access to their platforms through Stackla's application and the API and Stackla used its application and the API to access Defendants' platforms and to operate its business.

127.    Stackla accepted Defendants offer to become a FMP and performed all the obligations required by Defendants to obtain and maintain access to Defendants' platforms.

128.    By cutting off Stackla's access to Defendants' platforms and the API, Defendants are in breach of their obligations to Stackla, and have not cured such breach.

129.    Stackla has demanded and hereby demands reinstatement to Defendants' platforms.

130.    Stackla has been damaged by Defendants' breaches in an amount to be proven at trial, plus interest thereon.

131.    Stackla US prays for relief as set forth below.

**CLAIM FOR RELIEF NINE**
**Breach of the Implied Covenant of Good Faith and Fair Dealing**
**(Against All Defendants)**

132.    Stackla hereby incorporates by reference the allegations of the preceding paragraphs as though fully set forth herein.

133.    Pursuant to the MSA, Defendants' approval of Stackla's use of the API, and Stackla's acceptance as a Facebook Marketing Partner, these agreements impose a duty of good faith and fair dealing on Defendants, obligating Defendants not to do anything that would have the effect of injuring, impairing, or destroying the rights of Stackla to receive the benefits of those agreements.

134.    The purpose of the MSA was to provide software as a service and related services to Defendants.  The purpose of the API was to allow third party application developers like Stackla to access Defendants' platforms.  The purpose of Stackla's official designation as a Facebook Marketing Partner was to include Stackla in a global community of specialists known for their excellent service and technical skill, to provide client matches, and to give access to resources that can help fuel the growth of Stackla's business through the use of Defendants' platforms.  An essential component of all of these agreements is access by Stackla to Defendants' platforms, including the publicly available content thereon.

135.    The covenant of good faith and fair dealing obligates Defendants to perform in good faith consistently with these agreements, including allowing Defendants access to Defendants' platforms and the public content thereon.

136.    Defendants breached the implied covenant of good faith and fair dealing by cutting Stackla off from Defendants' API and platforms, preventing Stackla from performing under the MSA, and suspending Stackla as a Facebook Marketing Partner.

137.    Defendants conduct is subjectively and objectively unreasonable because Defendants are aware that Stackla's business relies on access to Facebook and Instagram, Stackla requires access to Defendants' platforms to perform services under the MSA, and Stackla was vetted and approved for participation using the API and in the Facebook Marketing Program,

1    which require access to and use of Defendants' platforms.

2       138.    As a direct and proximate result of Defendants' breaches of the implied covenant

3    of good faith and fair dealing, Defendants have suffered damages in an amount to be proven at

4    trial plus interest thereon, including but not limited to loss of its client contracts, loss of business

5    goodwill, loss of investor relationships, loss of its IPO, and the destruction of Stackla's business.

6                                    **PRAYER FOR RELIEF**

7       WHEREFORE, Plaintiffs pray for judgment against Defendants and each of them as

8    follows:

9       1.    For preliminary and permanent injunctive relief, pursuant to Federal Rule of Civil

10   Procedure 65, to prevent Defendants and each of them from curtailing Stackla's access to publicly

11   available information on Facebook and Instagram that is essential to Stackla's business or

12   otherwise engaging in unfair business practices as described herein;

13      2.    For a declaratory judgment in favor of Stackla and against Defendants and each of

14   them that Defendants are now and shall remain obligated to reinstate Stackla's access to and use

15   of Defendants' platforms and the publicly available content on Facebook and Instagram;

16      3.    For a declaratory judgment in favor of Stackla and against Defendants and each of

17   them that Stackla has not violated the CFAA or the CDAFA;

18      4.    For an order that Defendants shall be equitably bound by and estopped from

19   controverting their promises, including promises to grant Stackla access to publicly available data

20   on Facebook and Instagram;

21      5.    For damages in an amount to be proven at trial that are actually and proximately

22   caused by Defendants' conduct, and prejudgment interest recoverable thereon at the legal rate;

23      6.    For attorney fees and costs of suit as permitted by law; and

24      7.    Such other and further relief as the Court may deem just and proper.

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Dated:  September 19, 2019

FOR PLAINTIFFS STACKLA, INC.,
STACKLA LTD., and STACKLA PTY LTD.


By: /s/ *Isabelle L. Ord*
    Jeffrey E. Tsai
    Isabelle L. Ord
    David F. Gross
    Anthony L. Portelli
    DLA PIPER LLP (US)

1

## DEMAND FOR JURY TRIAL

2    Plaintiffs Stackla, Inc., Stackla Ltd., and Stackla Pty Ltd. hereby demand a jury trial as to

3  all claims for relief triable to a jury.

4

5  Dated:  September 19, 2019                        FOR PLAINTIFFS STACKLA, INC.,
                                                     STACKLA LTD., and STACKLA PTY LTD.
6

7

8                                                    By: /s/ *Isabelle L. Ord*
                                                        _____

9                                                        Jeffrey E. Tsai
                                                         Isabelle L. Ord
10                                                       David F. Gross
                                                         Anthony L. Portelli
11                                                       DLA PIPER LLP (US)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28