1   JEFFREY E. TSAI (SBN 226081)
    jeff.tsai@dlapiper.com
2   ISABELLE L. ORD (SBN 198224)
    isabelle.ord@dlapiper.com
3   DAVID F. GROSS (SBN 083547)
    david.gross@dlapiper.com
4   ANTHONY L. PORTELLI (SBN 280766)
    anthony.portelli@dlapiper.com
5   DLA PIPER LLP (US)
    555 Mission Street, Suite 2400
6   San Francisco, CA 94105
    Tel: 415.836.2500
7   Fax: 415.836.2501

8   Attorneys for Plaintiffs
    STACKLA, INC., STACKLA, LTD., and
9   STACKLA PTY LTD.

10                      UNITED STATES DISTRICT COURT

11                   NORTHERN DISTRICT OF CALIFORNIA

12                        SAN FRANCISCO DIVISION

13

14  STACKLA, INC., a Delaware Corporation,      Case No. 3:19-cv-5849
    STACKLA, LTD., AN English Limited
15  Company, and STACKLA, PTY, an
    Australian Proprietary Limited Company,     **PLAINTIFFS' MEMORANDUM OF**
16                                              **POINTS AND AUTHORITIES IN**
                   Plaintiffs,                  **SUPPORT OF *EX PARTE* MOTION FOR**
17                                              **TEMPORARY RESTRAINING ORDER**
                                                **AND ORDER TO SHOW CAUSE RE**
18  v.                                          **PRELIMINARY INJUNCTION**

19  FACEBOOK, INC., a Delaware Corporation,
    INSTAGRAM, LLC, a Delaware Limited
20  Liability Company, and DOES 1-50,

21                 Defendants.

22

23

24

25

26

27

28

DLA PIPER LLP (US)
SAN FRANCISCO

**TABLE OF CONTENTS**

Page

I.     INTRODUCTION ................................................................................1

II.    QUESTIONS PRESENTED ................................................................2

III.   STATEMENT OF FACTS ..................................................................3

       A.   Stackla's Business Model and Application Rely on Facebook and
            Instagram ...............................................................................3

       B.   Defendants' Platforms and Public User Content ...........................4

       C.   Stackla Becomes an Official Facebook Marketing Partner .............5

       D.   The Cambridge Analytica Scandal and Facebook's Privacy Practices ...........6

       E.   The August 2019 Business Insider Articles ..................................6

       F.   The August 30, 2019 Cease and Desist Letter and Termination of Access .............7

IV.    A TEMPORARY RESTRAINING ORDER AND PRELIMINARY
       INJUNCTION ARE NECESSARY TO PREVENT IRREPARABLE HARM TO
       STACKLA ........................................................................................8

       A.   Stackla Will Suffer Irreparable Harm Without an Injunction .................9

            1.   A TRO is Necessary for Stackla's Survival ..........................9

            2.   Other Courts Have Issued Injunctions in Similar Circumstances ...........10

       B.   The Balance Of Hardships Tips Strongly In Favor of Stackla .............10

       C.   Stackla is Likely to Succeed On the Merits of Its Claims....................11

            1.   Stackla is Likely to Prevail on its Claims for Intentional
                 Interference with Contract and Prospective Economic Advantage...........11

            2.   Stackla is Likely to Prevail on Its Claims for Unfair Competition .............13

            3.   Stackla is Likely to Prevail on its Breach of Contract and Breach of
                 the Implied Covenant Claims......................................16

            4.   Stackla is Likely to Prevail on its Promissory Estoppel Claim.................17

            5.   Stackla is Likely Entitled To Declaratory Judgment that It Has Not
                 Violated the CFAA or California Penal Code § 502(c) .............................19

                 a.   Defendants' claims would be brought for an improper
                      purpose and have an impermissible effect. ...............................19

                 b.   Stackla cannot be liable for violating the CFAA or
                      California Penal Code § 502(c)....................................20

       D.   An Injunction in Favor of Stackla is in the Public Interest ....................21

       E.   No Bond Should Issue ...............................................................21

V.     CONCLUSION..................................................................................21

1

## TABLE OF AUTHORITIES

**Page(s)**

2

**CASES**

3

4

*Acoustics, Inc. v. Trepte Constr. Co.*,
 14 Cal. App. 3d 887 (Cal. Ct. App. 1971) ...............................................................16

5

*Am. Passage Media Corp. v. Cass Commc'ns, Inc.*,
 750 F.2d 1470 (9th Cir. 1985)................................................................................9

6

7

*Bower v. AT&T Mobility, LLC*,
 196 Cal. App. 4th 1545 (2011)..............................................................................13

8

9

*Brinker v. JP Morgan Chase, N.A.*,
 No. 13-CV-01344-LHK, 2013 WL 7798675 (N.D. Cal. May 17, 2013) ..............................16

10

*Cabell v. Zorro Prods., Inc.*,
 No. 5:15-CV-00771 (EJD), 2017 WL 2335597 (N.D. Cal. May 30, 2017) ...........................19

11

12

*Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*,
 20 Cal. 4th 163 (1999) ........................................................................................14

13

14

*Colonial Life & Accident Ins. Co. v. Stentorians-L.A. Cnty. Blackfire*,
 13-CV-9235-CAS, 2013 WL 6732687 (C.D. Cal. Dec. 19, 2013)........................................16

15

*CRST Van Expedited, Inc. v. Werner Enters., Inc.*,
 479 F.3d 1099 (9th Cir. 2007)..............................................................................12, 13, 14

16

17

*Disney Enterprises, Inc. v. Redbox Automated Retail, LLC*,
 No. CV1708655DDPAGRX, 2018 WL 1942139 (C.D. Cal. Feb. 20, 2018)........................11

18

19

*Edmonds v. Los Angeles Cty.*,
 40 Cal. 2d 642 (1953) ........................................................................................19

20

*Freedom Holdings, Inc. v. Spitzer*,
 408 F.3d 112 (2nd Cir. 2005)................................................................................9

21

22

*Garcia v. World Sav., FSB*,
 183 Cal. App. 4th 1031 (2010)..............................................................................17

23

24

*H&M Assocs. v. City of El Centro*,
 109 Cal. App. 3d 399 (1980)................................................................................12

25

*hiQ Labs, Inc. v. LinkedIn Corp.*,
 No. 17-16783, 2019 WL 4251889 (9th Cir. Sept. 9, 2019) ...........................9, 10, 20

26

27

*In re Tobacco II Cases*,
 46 Cal. 4th 298 (2009) ........................................................................................15

28

ii

PLAINTIFFS' MPA ISO APPLICATION FOR TRO AND OSC RE PRELIMINARY INJUNCTION

WEST\287747694.5

*In re Yahoo! Inc. Customer Data Sec. Breach Litig.*,
   No. 16-MD-02752-LHK, 2017 WL 3727318 (N.D. Cal. Aug. 30, 2017) ...............................16

*Jorgenson v. Cassiday*,
   320 F.3d 906 (9th Cir. 2003)..........................................................................................21

*Kaiser Trading Co. v. Associated Metals & Minerals Corp.*,
   321 F. Supp. 923 (N.D. Cal. 1970) .................................................................................17

*Korea Supply Co. v. Lockheed Martin Corp.*,
   29 Cal. 4th 1134 (2003) .........................................................................................11, 12

*Kwikset Corp. v. Super. Ct.*,
   51 Cal. 4th 310 (2011) ...................................................................................................14

*Max Factor & Co. v. Factor*,
   226 F. Supp. 120 (S.D. Cal. 1963) .................................................................................21

*McKell v. Washington Mut., Inc.*,
   142 Cal. App. 4th 1457 (2006) ......................................................................................14

*MedImmune, Inc. v. Genentech, Inc.*,
   549 U.S. 118 (2007) .......................................................................................................19

*Metro-Goldwyn-Mayer, Inc. v. Lee*,
   212 Cal. App. 2d 23 (1963).............................................................................................21

*Motors, Inc. v. Times Mirror Co.*,
   102 Cal. App. 3d 735 (1980) ..........................................................................................14

*Nicol v. Nelson*,
   776 P.2d 1144 (Colo. App. 1989) ...................................................................................18

*Patino v. Franklin CreditMgmt. Corp*,
   No. 16-cv-02695-LB, 2017 WL 1246853 (N.D. Cal. Apr. 5, 2017)......................................8, 9

*Pemberton v. Nationstar Mortg. LLC*,
   331 F. Supp. 3d 1018 (S.D. Cal. 2018) ..........................................................................13

*Phillips v. Crown Central Petroleum Corp.*,
   602 F.2d 616 (4th Cir. 1979)..........................................................................................20

*Reeves v. Hanlon*,
   33 Cal. 4th 1140 (2004) .........................................................................................11, 12

*S. Bay Chevrolet v. Gen. Motors Acceptance Corp.*,
   72 Cal. App. 4th 861 (1999)...........................................................................................14

*Shippers, Inc. v. Fontenot*,
   No. 13CV1349 JLS (MDD), 2013 WL 12092056 (S.D. Cal. Sept. 23, 2013) ......................9

1
2

*StuhlbargInt'l Sales Co., Inc. v. John D. Brush & Co. Inc.*,
    240 F.3d 832 (9th Cir. 2001) ..................................................................................9

3

*Synopsys, Inc. v. Ubiquiti Networks, Inc.*,
    313 F. Supp. 3d 1056 (N.D. Cal. 2018) ...............................................................20

4
5

*Toscano v. Greene Music*,
    124 Cal. App. 4th 685 (2004) ..............................................................................17

6
7

*TransFresh Corp. v. Ganzerla & Assoc., Inc.*,
    862 F. Supp. 2d 1009 (N.D. Cal. 2012) ...............................................................19

8

*Washington Capitols Basketball Club, Inc. v. Barry*,
    304 F. Supp. 1193 (N.D. Cal. 1969) ....................................................................17

9

**STATUTES**

10

18 U.S.C. § 1030 ..........................................................................................................7

11

28 U.S.C. § 2201 ........................................................................................................19

12
13

Cal. Bus. & Prof. Code § 17200 ..........................................................................13, 14

14

Cal. Bus. & Prof. Code § 17204 ................................................................................13

15

Cal. Penal Code § 502(c) .....................................................................................19, 20

16
17
18
19
20
21
22
23
24
25
26
27
28

DLA PIPER LLP (US)
SAN FRANCISCO

iv

## I. **INTRODUCTION**

Defendants Facebook, Inc. and Instagram, LLC (together, "Defendants"), the world's largest social network with over 2.4 billion monthly active users, abruptly and unlawfully terminated the access of Plaintiffs Stackla Pty. Ltd. ("Stackla Pty"), Stackla Ltd., and Stackla Inc. ("Stackla US") (collectively, "Stackla") to their platforms and public content thereon although Defendants know that Stackla's entire business model relies on access to that content. Stackla is an enterprise platform that enables its clients to source high-quality, branded, public content created by loyal customers on social media, gain rights to use this content, and then re-purpose it for marketing activities. *See* Declaration of Damien Mahoney ("Mahoney Decl."), ¶ 5. More than 80 percent of the content sourced for Stackla's customers comes from public material on Facebook and Instagram, and without access to those platforms, Stackla's business will be destroyed. *Id.*, ¶ 13. As a result of Defendants' conduct a majority of Stackla's 280 major business customers have already raised concerns regarding lack of access and Stackla's breach of their agreements, and if Stackla's access to Defendants' platforms is not restored, Stackla will be irreparably harmed because its business will be destroyed and it will become insolvent. *Id.*, ¶ 36.

Defendants' conduct is inexplicable because Defendants have not identified any actual harm to themselves or their users from Stackla's use of their platforms. Further, Defendants acknowledge that the content belongs to the users, who choose whether to designate that content as public. Yet, Defendants purportedly cut Stackla off from their platforms to protect their users and users' content. This is plainly pre-textual because Defendants recently vetted and approved Stackla's access to their platforms as an official Facebook Marketing Partner ("FMP") after over a year of reviews and diligence of Stackla's business model and application.

This Court should issue a temporary restraining order and preliminary injunction to enjoin Defendants from denying Stackla access to Defendants' platforms and the public content available thereon because Stackla's business will be destroyed without this relief. Stackla alleges a number of claims for relief against Defendants herein which demonstrate that Defendants' actions are anti-competitive and designed to prevent Stackla and anyone but Defendants from using public content for business purposes. Defendants cannot use the law for an improper

1    purpose to obtain exclusive proprietary control over public data that is owned by their users, and

2    which anyone can freely access—except Stackla.  Defendants have threatened to sue Stackla

3    under manifestly inapposite federal and state laws pertaining to unauthorized computer and

4    network access and to intimidate Stackla into abandoning any reliance on Facebook or Instagram.

5         Defendants have put Stackla in an impossible position.  If Stackla acquiesces to

6    Defendants' unreasonable demands and has no access to Defendants' platforms, Stackla's

7    business will be destroyed.  Stackla therefore has filed this action to obtain a declaration of the

8    parties' rights and liabilities under the federal and state laws relied on by Defendants and for

9    affirmative relief under common law, statutes, and contract for Defendants' unlawful actions—

10   which appear to be an attempt to and will in fact destroy Stackla's business.  Stackla meets the

11   legal standard for a temporary restraining order and a preliminary injunction as set forth here.

12   Relief is immediately required because Stackla will lose its client contracts, employees, business

13   goodwill, investors, and its IPO opportunity, and will be insolvent if it cannot access the public

14   social media content on which its business depends. Mahoney Decl., ¶¶ 38-39.  By contrast,

15   Defendants have not asserted any harm to themselves or their users by Stackla's continued access

16   to their platforms and public content that it formerly enjoyed with Facebook's approval.

17   **II.    <u>QUESTIONS PRESENTED</u>**

18   1.    <u>**Do Defendants' Actions Threaten Immediate, Irreparable Harm to Stackla?**</u> Yes.

19   Denying Stackla access to Defendants' platforms and public content will destroy Stackla's

20   business and cause Stackla to become insolvent.  This is tantamount to a corporate death sentence

21   and no more serious harm to a business is possible.

22   2.    <u>**Does Stackla Present A Likelihood of Success on the Merits?**</u> Yes. Applicable law

23   establishes that Defendants cannot selectively deny Stackla access for an unfair purpose to

24   effectively choose market winners and losers by providing themselves and others an exclusive

25   right to public content of Defendants' users.   These users, not Defendants, own the content and

26   designate it as public.  Defendants' reliance on laws to prevent abusive computer and network

27   invasion perverts the principles of those laws by using them as a sword to prevent legitimate use

28   rather than as a shield against unlawful harm.  Defendants' conduct is intentional and anti-

1  competitive, detrimentally interferes with Stackla's business and its contracts with its clients, is a

2  prime example of unfair business practices, and is in breach of the parties' agreements and the

3  implied covenant of good faith and fair dealing.  Defendants are also estopped to deny Stackla

4  access to the user content because Defendants promised that user data would be public, and

5  reviewed and approved Stackla's business model and application for Stackla to be a FMP

6  knowing that Stackla's business model is dependent on access to Defendants' platforms.

7  3.     **Does the Balance of Equities Tip Sharply in Stackla's Favor?** Yes. Without an

8  injunction Stackla's business will be destroyed and Stackla will be insolvent.  In contrast,

9  Defendants will not be harmed by permitting the *status quo* to continue while the merits are

10  decided.  The scales of justice in this case are tipped fully in Stackla's favor.

11  4.     **Would the Requested Injunction Serve the Public Interest?** Yes. The public has an

12  interest in the free flow of public information and the preservation of a valuable company like

13  Stackla, which will otherwise be forced to shut down long before the merits can be decided. The

14  public also has an important interest in ensuring proper enforcement of California's Unfair

15  Competition Law, the restraint of improper and anti-competitive behavior, and in enjoying the

16  benefits, both economic and moral, of preserving a level playing field and the status quo.

17  **III.     STATEMENT OF FACTS**

18  **A.     Stackla's Business Model and Application Rely on Facebook and Instagram**

19  Stackla's business[1] is predicated on access to publicly available information on Facebook

20  and Instagram. Virtually all of Stackla's clients are heavily and almost exclusively reliant on

21  Facebook and Instagram content to derive value from Stackla's platform. *Id.*, ¶ 15. In fact,

22  approximately 80 percent of the content collected by Stackla's clients comes from publicly

23  available information created by social media users on Facebook and Instagram. *Id.*, ¶ 13. If

24  Stackla does not have access to this content, Stackla's clients will not use Stackla, and Stackla

25

26  [1] Stackla operates a software-as-a-service (SaaS) business and sells annual cloud software subscriptions to clients.
Mahoney Decl., ¶ 9. Stackla operates through three related companies servicing different regions throughout the

27  world. *Id.*, ¶ 8. Stackla has more than 280 major business clients, including many of the world's most recognizable
brands, such as McDonalds, Cirque du Soleil, LUSH Cosmetics, Leading Hotels of the World and Expedia. *Id.*, ¶ 9.

28  Stackla helps its clients source high-quality, branded, public content from their loyal customers, gain approval to use
this content, and then re-purpose this content in their own marketing activities. *Id.*, ¶ 5.

DLA PIPER LLP (US)
SAN FRANCISCO

3

PLAINTIFFS' MPA ISO APPLICATION FOR TRO AND OSC RE PRELIMINARY INJUNCTION
WEST\287747694.5

1    will be damaged to the point that the business will be unable to continue. *Id.*, ¶ 15-16.  Without

2    access to Facebook and Instagram, Stackla will be required to terminate its customer contracts,

3    lay off its employees, lose its investor relationship, forgo its initial public offering, and will be

4    insolvent.  *Id.*, ¶ 2.

5         Stackla's business model and application allow its clients to access public content on

6    Facebook and Instagram through open source methods permitted by Facebook.  *Id.*, ¶ 13. All

7    content is publicly available and sourced via approved or publicly available endpoints from

8    Facebook and Instagram. *Id.*  Stackla's platform does not interact with, change, or interfere with

9    the user interfaces for Facebook or Instagram, and does not access private content that is visible

10   only to "friends" or "followers" of users. *Id.*, ¶ 14.

11        Stackla uses the Facebook Open Graph Application Programming Interface (or "API")

12   developed and offered by Facebook for third party application developers like Stackla to allow

13   Stackla's customers to discover content on Facebook or Instagram.  Access by Stackla's clients is

14   enabled only through the clients' unique access tokens generated via Facebook's own

15   authentication process.  All content collected through the API is publicly available and sourced

16   via approved or publicly available endpoints from Facebook and Instagram.  *Id.* Stackla queries

17   that data to discover the most compelling public content produced by social media users about the

18   brands of Stackla's clients, which Stackla curates, sorts, and stages for review by the clients.

19   Then, Stackla facilitates a process to enable Stackla's clients to acquire the rights to the selected

20   content from the social media users who created it, and once approved, Stackla's clients can use

21   this rights-approved content in their own marketing campaigns across the web, in social media

22   posts, digital advertising, e-commerce, and live event screen/billboard advertising. Mahoney

23   Decl., ¶ 11.

24        **B.**      **Defendants' Platforms and Public User Content**

25        Defendants comprise the world's largest social network, with over 2.4 billion monthly

26   active users. Facebook "enable[s] people to connect with each other, build communities," and

27   "express [one]self" through "sharing status updates, photos, videos, and stories" or "adding

28   content" to one's profile.  *See* Mahoney Decl., Ex. A.  Defendants allow users to choose the

content they share. Specifically, Facebook's users can choose to (1) share data that is only visible to them; (2) share data that is visible to "friends" and "friends of anyone tagged in the data; and (3) share data that "anyone including people off of Facebook can see." *See* Declaration of Jeffrey E. Tsai ("Tsai Decl."), Ex. B.  Similarly, Instagram allows users to post data that "anyone will be able to see [] on the web." *Id.*, Ex. C.

Far from harming Defendants' users, Stackla highlights precisely the type of quality user-created, social media content that lead Defendants' users to create and share their content publicly in the first place, and drives traffic to Defendants' platforms.  For both Facebook and Instagram, if a user sets her posts to "public," anyone— including people outside the platforms— can see the content.  *See Id.*, Ex. C. ("If your posts are set to public, anyone will be able to see your profile by visiting instagram.com/[your username] on the web.") & Ex. B. ("When you share something with Public that means anyone including people off of Facebook can see it."). While other social media platforms exist beyond Facebook and Instagram, they do not have the same number of users or the same quality and volume of content, and do not offer a viable alternative.  *See* Mahoney Decl., ¶ 15.  Defendants are the dominant market leaders in social media with the most user-created content, and are the primary source of content for Stackla's clients. *Id.*  Without access to Defendants' content, Stackla's clients will not use Stackla.  *Id.*

### C.    Stackla Becomes an Official Facebook Marketing Partner

Facebook offers a Facebook Marketing Partner program, "a global community of specialists known for their excellent service and technical skill. The program offers client matches and gives access to resources that can help fuel the growth of your business." *Id.*, ¶ 18. In April 2018, Stackla applied to become an official Facebook Marketing Partner ("FMP"). *Id.*

All FMPs are supported and vetted by Facebook. *Id.*, ¶ 17. The process of becoming an official FMP took more than a year and involved extensive review and vetting of Stackla's business model, client base, and application, including demonstrations of the Stackla platform and in-applications reviews as recently as May 2019. *Id.*, ¶ 20. On May 25, 2019, Facebook accepted Stackla into the FMP program and Stackla appeared on the FMP site as an official partner of Facebook on May 29, 2019. *Id.*, ¶ 19. As an FMP, Stackla was awarded a Facebook Marketing

1    Badge, which is given only to companies "who meet the highest standards of performance and

2    service. If you've got a badge, it tells everyone you're among the best at what you do." *Id.*

3    Stackla's core value proposition, its use of Facebook and Instagram content, and business model

4    has not changed since Facebook vetted Stackla just a few months ago. *Id.*, ¶ 17.

5            **D.**       **The Cambridge Analytica Scandal and Facebook's Privacy Practices**

6         In 2010, Facebook launched the Open Graph API for third party applications, allowing

7    external developers to connect with Facebook's users and to request permission to access their

8    content. Tsai Decl., Ex. D. In 2015, *The Guardian* broke the story of a massive scandal involving

9    misappropriation of tens of millions of Facebook users' information from the Facebook platform

10   by Cambridge Analytica, a British political consulting firm. *Id.*, Ex. E. In response, Facebook

11   denied the application developer access to the Facebook platform and demanded deletion of the

12   user information given to Cambridge Analytica. *Id.*, Ex. D. However, in 2018, *The Guardian* and

13   the *New York Times,* among others, reported that more than 50 million Facebook users' profiles

14   were harvested for Cambridge Analytica. *Id.*, Ex. F. Later in March 2018, the Federal Trade

15   Commission opened an investigation into whether Facebook had violated a prior settlement with

16   the FTC relating to Facebook user protections, which Facebook ultimately settled in 2019 for a

17   record-breaking $5 billion dollar fine. *Id.*, Ex. G. Facebook remains under the shadow of the

18   Cambridge Analytica scandal with continuing regulatory investigations and scrutiny of its privacy

19   practices.

20            **E.**       **The August 2019 Business Insider Articles**

21         On or about August 7, 2019, Business Insider—an online popular news organization—

22   published an article asserting that Instagram's lax privacy practices had allowed another

23   advertising partner to track and store user location profiles, improperly store user content without

24   permission, and re-sell user profiles built with Facebook and Instagram data for advertising

25   and/or third party consumer tracking purposes. *See* Mahoney Decl., ¶ 24. This article drew

26   unwanted attention to Instagram because, to some extent, Facebook had managed to steer the

27   scrutiny of its privacy practices away from Instagram. Now, suddenly Business Insider had

28   placed Instagram squarely in the midst of Facebook's privacy challenges, creating a major threat

1 to Instagram's business.  Business Insider called it "Instagram's Cambridge Analytica moment."

2 Tsai Decl.*, Ex. H.

3       On or about August 23, 2019, Business Insider published a second article reporting that

4 Facebook was reviewing its FMPs over Instagram data scraping issues. Mahoney Decl.., ¶ 25.

5 The article reported inaccurately that Stackla might be scraping data from Instagram. *Id.*  Stackla

6 strongly denied the allegation.  *Id.*  Stackla attempted to confirm to Defendants directly on

7 multiple occasions that it was not scraping data from Instagram, but Stackla's attempts were met

8 with radio-silence, and Defendants have never responded to Stackla. *Id.*, ¶ 28, 34.

9       **F.**      **The August 30, 2019 Cease and Desist Letter and Termination of Access**

10       On August 30, 2019, just a few months after Facebook's successful vetting of Stackla as

11 an FMP, Stackla received a "Cease and Desist Abuse of Facebook" letter on August 30, 2019 (the

12 "Cease-and-Desist Letter") that essentially demanded that Stackla destroy its entire business.

13 Mahoney Decl., ¶ 29. The Cease-and-Desist Letter accused Stackla of violating (i) state and

14 federal laws, including the Computer Fraud And Abuse Act, 18 U.S.C. § 1030 and the California

15 Comprehensive Computer Data Access and Fraud Act, California Penal Code § 502(c), (ii)

16 Instagram's Terms of Use and Platform Policy, and (iii) Facebook's Terms of Service and

17 Platform Policy. *Id.*, Ex. I. In addition, the Cease-and-Desist Letter asserted that Stackla had

18 breached a Master Subscription Agreement ("MSA"). *Id.*  Lastly, the letter stated that Stackla was

19 suspended as a FMP and demanded that Stackla cease accessing Facebook or Instagram and agree

20 never to do so again in the future. *Id.*, ¶ 29.  Among other draconian demands, the Cease-and-

21 Desist Letter also demanded that Stackla turn over its proprietary information, including software

22 code.

23       That same day, Stackla's access to the API was terminated, cutting Stackla off from

24 Facebook and Instagram. *Id.*, ¶30. The personal Facebook and Instagram accounts of its officers

25 were also terminated, and a number of Stackla's current and former employees were barred

26 access to their personal accounts without notice or explanation.  *Id.*

27 /////

28

1   Stackla was shocked to receive the Cease-and-Desist Letter, especially after its recent

2   vetting as a FMP, its strong public denial in the Business Insider article, and its multiple

3   communications to Defendants denying the allegations both before and after the article was

4   published. *Id.*, ¶¶ 17, 25, 28, 34. Stackla was also shocked that its access to Facebook and

5   Instagram was cut off that same day, crippling its business. *Id.*, ¶ 31.

6   Stackla promptly retained counsel and responded to the Cease-and-Desist Letter, disputing

7   that Stackla scraped data from Instagram, demanding reinstatement on Defendants' platforms,

8   and informing Defendants of the irreparable harm Defendants had caused and were continuing to

9   cause to Stackla. *Id.*, ¶ 33. The parties have attempted further communications without result as

10   Stackla's access to Facebook and Instagram is still completely cut off, and on September 16,

11   2019, Defendants' counsel confirmed that Defendants would not be reinstating Stackla. *Id.*, ¶ 35.

12   Tsai Decl., ¶ 4.

13   Since the Cease-and-Desist Letter, media sources have reported that Stackla's business is

14   in jeopardy due to Defendants' actions and that Stackla's initial public offering is in limbo. *Id.*,

15   ¶ 39. A majority of Stackla's customers have already raised their concerns regarding lack of

16   access and Stackla's breach, and if not cured, Stackla's customer contracts will be terminated. *Id.*,

17   ¶ 36.  Stackla is losing business every day and will soon reach a tipping point where Stackla can

18   no longer operate. *Id.*, ¶ 38.

19   **ARGUMENT**

20   **IV.   A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION ARE NECESSARY TO PREVENT IRREPARABLE HARM TO STACKLA**

21

22   Stackla meets the legal standard for a temporary restraining order here, including

23   establishing (1) a likelihood of **immediate** irreparable harm that would result if an injunction

24   were not issued, (2) a likelihood of success on the merits, (3) the balance of equities tips in favor

25   of the plaintiff, and (4) an injunction is in the public interest. *Patino v. Franklin CreditMgmt.*

26   *Corp*, No. 16-cv-02695-LB, 2017 WL 1246853, at *1-2 (N.D. Cal. Apr. 5, 2017). In addition, the

27   court uses "a 'sliding scale' approach to these factors, according to which 'a stronger showing of

28   one element may offset a weaker showing of another.' [] So, when the balance of hardships tips

1   sharply in the plaintiff's favor, the plaintiff need demonstrate only 'serious questions going to the

2   merits.'" *hiQ Labs, Inc. v. LinkedIn Corp.*, No. 17-16783, 2019 WL 4251889, at *4 (9th Cir.

3   Sept. 9, 2019) (affirming injunctive relief where a business would be destroyed without access to

4   a social media platform).  Here, the balance of the equities is also sharply tipped in Stackla's

5   favor.

6           **A.      Stackla Will Suffer Irreparable Harm Without an Injunction**

7           Stackla's business will be destroyed and it will be insolvent if access to Defendants'

8   platforms and public content is not restored.  Stackla cannot wait for an adjudication on the merits

9   because a majority of Stackla's customers have already raised their concerns regarding lack of

10  access and Stackla's breach of their contracts and the rest will soon follow.  Mahoney Decl., ¶ 36.

11  Stackla will lose its clients and revenue, and it has been unable to bring in new clients since news

12  of Defendants' conduct has been made public.  *Id.*, ¶ 38.  Absent emergency relief, Stackla's

13  business will be irretrievably destroyed before any hearing can take place and any relief on the

14  merits will be too late to save Stackla.

15                  *1.      A TRO is Necessary for Stackla's Survival*

16          A temporary restraining order "preserves the status quo and prevents irreparable harm

17  until a hearing can be held on a preliminary injunction application." *Patino*, 2017 WL 1246853,

18  at *1.  The standard for granting a temporary restraining order is "substantially identical" to the

19  standard for granting a preliminary injunction. *StuhlbargInt'l Sales Co., Inc. v. John D. Brush &*

20  *Co. Inc.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001). A temporary restraining order must issue now to

21  preserve the status quo. Irreparable injury is "the single most important prerequisite for the

22  issuance of a preliminary injunction." *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 114 (2nd

23  Cir. 2005). "The threat of being driven out of business is sufficient to establish irreparable harm."

24  *Am. Passage Media Corp. v. Cass Commc'ns, Inc.*, 750 F.2d 1470, 1474 (9th Cir. 1985). In

25  addition, the loss of current and prospective customers "is considered to be irreparable harm that

26  justifies equitable relief." *Shippers, Inc. v. Fontenot*, No. 13CV1349 JLS (MDD), 2013 WL

27  12092056 at *6 (S.D. Cal. Sept. 23, 2013).  There is no more irreparable harm than the total

28  destruction of a business which will become insolvent and fail if relief is not granted. *hiQ Labs,*

*Inc. v. LinkedIn Corp.*, No. 17-16783, 2019 WL 4251889, at *4 (9th Cir. Sept. 9, 2019) ("showing a threat of 'extinction' is enough to establish irreparable harm").  For over seven years, Stackla invested in building its business based on public content available on Facebook and Instagram.  Mahoney Decl., ¶ 3, 5.  If access to this content is denied, then Stackla will breach its client agreements, lose its prospective clients and investors, will be unable to make an initial public offering, must lay off its employees, and shutter its operations. *Id.*, ¶ 2, 36-39.  No other public or non-public sources of content can replace the content from Facebook and Instagram, and no other comparable public platform exists. *Id.*, ¶ 15.

> ### 2.    Other Courts Have Issued Injunctions in Similar Circumstances

Stackla is not the first victim of Defendants' anti-competitive and business destroying conduct.  On April 15, 2019, another company cut off by Defendants obtained an injunction against Facebook in the Federal Court of Australia, Victoria District, in the matter of *Dialogue Consulting Pty Ltd. v. Instagram, Inc.,* VID 369/2019, preventing the destruction of its business.  On May 3, 2019, Instagram was also joined in that matter.  Request for Judicial Notice ("RJN"), Exs. A-B.  There is also recent Ninth Circuit precedent for injunctive relief in the September 9, 2019, opinion of the Court of Appeals for the Ninth Circuit in the matter of *hiQ Labs, Inc. v. LinkedIn Corporation*, No. 17-16783 (District Court No. 3:17-cv-03301-EMC).  Under similar circumstances, the Ninth Circuit affirmed an order enjoining another social media company from barring a plaintiff access to its platform and public content because plaintiff's entire business was predicated on that content and would be destroyed if not allowed access.  *Id.* at Ex. C; *hiQ Labs, Inc. v. LinkedIn Corp.*, No. 17-16783, 2019 WL 4251889, at *5 (9th Cir. Sept. 9, 2019). As the Ninth Circuit put it, "showing a threat of extinction" is sufficient for a business to establish irreparable harm.  *Id.*

**B.    The Balance Of Hardships Tips Strongly In Favor of Stackla**

Facebook's revocation of Stackla's access to public content on Facebook and Instagram will devastate Stackla, while retaining the *status quo* of access to Defendants' platforms would have little, if any, negative effect on Defendants.  Facebook alone is currently valued at approximately $140 billion, even after the Cambridge Analytica scandal and related regulatory

1   consequences. Whatever adverse economic effect Stackla's existence could conceivably have on

2   Defendants could not possibly warrant the extinction of Stackla before a preliminary injunction

3   hearing occurs.

4       It bears emphasizing that Stackla considers that its service—of connecting content-

5   creating users who publicly support a Stackla client's brand to the client so that the content (once

6   rights are approved) is used in advertising—only adds value to Defendants and their content-

7   creating users. This is a situation in which an injunction aids both parties, and allows the *status*

8   *quo* to continue pending a hearing.

9       **C.   Stackla is Likely to Succeed On the Merits of Its Claims**

10          *1.   Stackla is Likely to Prevail on its Claims for Intentional Interference with
              Contract and Prospective Economic Advantage*

11

12      Under California law, "a stranger to a contract may be liable in tort for intentionally

13   interfering with the performance of that contract." *Reeves v. Hanlon*, 33 Cal. 4th 1140, 1148

14   (2004) (internal cites omitted). To show intentional interference with an existing contractual

15   relationship, a plaintiff must demonstrate "(1) a valid contract between plaintiff and a third party;

16   (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a

17   breach or disruption of the contractual relationship; (4) actual breach or disruption of the

18   contractual relationship; and (5) resulting damage." *Disney Enterprises, Inc. v. Redbox Automated

19   Retail, LLC*, No. CV1708655DDPAGRX, 2018 WL 1942139, at *9 (C.D. Cal. Feb. 20, 2018). To

20   show interference with prospective economic advantage, a plaintiff must also plead and prove

21   "that the defendant engaged in an independently wrongful act," which means an act that is

22   "'proscribed by some constitutional, statutory, regulatory, common law, or other determinable

23   legal standard." *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1158-1159

24   (2003).

25      First, Stackla has valid customer contracts with approximately 280 clients. *See* Mahoney

26   Decl., ¶ 9. Second, Defendants have and had knowledge of Stackla's valid customer contracts,

27   especially through the FMP application, vetting, and approval process. *Id.*, ¶ 21. Stackla also

28   informed Facebook of its base of clients, ensuring such knowledge. *Id.*

1       Second, to demonstrate intentional interference, Stackla can show that Defendants knew

2   that disruption was certain to occur as a result of its actions.  *Reeves*, 33 Cal. 4th at 1148. Here,

3   Defendants knew that Stackla's business depended on access to Facebook and Instagram and that

4   its client relationships and entire business would be destroyed if access to their platforms and

5   public content was denied. Mahoney Decl., ¶ 13-21.

6       Third, Facebook's actions have disrupted and will continue to disrupt Stackla's business,

7   including requiring Stackla, to breach its client contracts.  *See* Mahoney Decl., *passim*.  This has

8   already begun as a majority of Stackla's customers have already raised their concerns regarding

9   lack of access and Stackla's breach, and if not cured, Stackla's customer contracts will be

10  terminated.  *Id.*, ¶ 36. As Stackla's entire business is premised on accessing public content on

11  Facebook and Instagram to provide marketing strategies to clients, the inevitable result of

12  Defendants' actions is destruction of Stackla's business. *Id.*, ¶ 9-16. Terminating an essential

13  service so that a company cannot perform its contracts is intentional interference.  *H&M Assocs.*

14  *v. City of El Centro*, 109 Cal. App. 3d 399, 405 (1980). Just as cutting off a water supply

15  eliminated a landlord's ability to keep his tenants, cutting off Stackla's access to public content

16  on Facebook and Instagram will require Stackla to breach its client contracts and prevent it from

17  consummating pending contracts with prospective clients.  Mahoney Decl., ¶ 2, 36-38.  It will

18  also disrupt Stackla's investor relationships and prevent Stackla's IPO.

19      Fourth, the damage requirement is easily satisfied because, as detailed herein, Stackla will

20  suffer the loss of its entire business, its IPO, and insolvency if Defendants' acts are not restrained.

21  *Id.*, ¶ 2, 31, 36-39.

22      For Stackla's claim for interference with prospective economic advantage, Defendants

23  have committed an "independently wrongful act." *See Korea Supply Co*., 29 Cal. 4th at 1158.

24  Stackla need only establish that Defendants' acts "were unlawful for a reason other than that they

25  interfered with [plaintiff's] prospective economic advantage" to establish that Defendants

26  committed an independently wrongful act. *CRST Van Expedited, Inc. v. Werner Enters., Inc.*, 479

27  F.3d 1099, 1110 (9th Cir. 2007).  Defendants actually committed three independently wrongful

28  acts when they revoked Stackla's access to public content on their platforms:  Defendants (1)

1    breached their MSA; (2) breached their express promises (including that their user content is

2    "public," users control the visibility of their content, and anyone including Stackla may access

3    and share the public content); and (3) violated the UCL, which constituted unfair and business

4    practices.[2] *See infra.*  Defendants should not be allowed to intentionally and wrongfully disrupt

5    Stackla's client contracts, prospective client and investor relationships, employee relationships,

6    and even Stackla's solvency by revoking access to Defendants' platforms and public content.

7             *2.        Stackla is Likely to Prevail on Its Claims for Unfair Competition*

8             California's Unfair Competition Law ("UCL") prohibits any "unlawful, unfair or

9    fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200. "Each prong of the UCL is

10   a separate and distinct theory of liability" and "an independent basis for relief." *Pemberton v.*

11   *Nationstar Mortg. LLC*, 331 F. Supp. 3d 1018, 1047 (S.D. Cal. 2018). Defendants' decision to

12   deny Stackla access to admittedly "public" content on their platforms is unlawful, unfair, and

13   fraudulent.

14            Under Business & Professions Code § 17204, Stackla has standing to seek injunctive

15   relief.  "[T]o have standing to bring a section 17200 cause of action, a plaintiff must (1) establish

16   a loss or deprivation of money or property sufficient to qualify as injury in fact, i.e., economic

17   injury, and (2) show that the economic injury was the result of, i.e., caused by, the unfair business

18   practice [] that is the gravamen of the claim." *Bower v. AT&T Mobility, LLC*, 196 Cal. App. 4th

19   1545, 1554 (2011).  The injury in fact requirement is satisfied if Stackla can show "an invasion of

20   a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent,

21   not conjectural or hypothetical." *Id.* (internal citations and quotations omitted).   Here, Stackla's

22   injuries—the loss of current and prospective revenues from its client contracts, the loss of

23   investor relationships and its IPO, and its ultimate insolvency—are all economic and caused by

24   Defendants' termination of Stackla's access to public content on Defendants' platforms.

25   /////

26   _____

     [2] A violation of the UCL is sufficient to establish an "independently wrongful act" for a claim for interference with
27   prospective economic advantage. *CRST Van Expedited, Inc.* 479 F.3d at 1110-11 ("We see nothing inconsistent with
     *Della Penna* in recognizing that the requirement of an independently wrongful act under the California law of
28   intentional interference with prospective economic relations may be satisfied even by an alleged violation of a
     borrowing statute like the UCL.").

1    "Injunctions are 'the primary form of relief available under the UCL,'" and essential to the

2    survival of Stackla here. *Kwikset Corp. v. Super. Ct.*, 51 Cal. 4th 310, 337 (2011).

3         Defendants' disruption of Stackla's contractual and prospective client relationships, its

4    investor relationships and IPO, and its business as a whole are unlawful and constitute violations

5    of the UCL. The UCL borrows "violations of other laws and treats them as unlawful practices that

6    the unfair competition law makes independently actionable." *Cel-Tech Commc'ns, Inc. v. Los*

7    *Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999). Thus, Defendants' conduct establishes a

8    claim under the "unlawful" prong of the UCL. *CRST Van Expedited, Inc. v. Werner Enters., Inc.*,

9    479 F.3d 1099 (9th Cir. 2007).

10        Defendants' termination of Stackla's access to public content on Defendants' platforms is

11   an "unfair" practice under the UCL.  "Unfair" practices are viewed broadly:  "In permitting the

12   restraining of all 'unfair' business practices, section [17200] undeniably establishes only a wide

13   standard to guide courts of equity; as noted above, given the creative nature of the scheming

14   mind. . . . (I)t would be impossible to draft in advance detailed plans and specifications of all acts

15   and conduct to be prohibited (citations omitted), since unfair or fraudulent business practices may

16   run the gamut of human ingenuity and chicanery." *Motors, Inc. v. Times Mirror Co.*, 102 Cal.

17   App. 3d 735, 739-40 (1980) (internal quotes and cites omitted).

18        A business practice is "unfair" "if it violates established public policy or if it is immoral,

19   unethical, oppressive or unscrupulous and causes injury to consumers which outweighs its

20   benefits. . . . The determination whether a business practice is unfair involves an examination of

21   [that practice's] impact on its alleged victim, balanced against the reasons, justifications and

22   motives of the alleged wrongdoer.  The court must weigh the utility of the defendant's conduct

23   against the gravity of the harm to the alleged victim." *McKell v. Washington Mut., Inc.*, 142 Cal.

24   App. 4th 1457, 1473 (2006) (internal cites and quotes omitted); *S. Bay Chevrolet v. Gen. Motors*

25   *Acceptance Corp.*, 72 Cal. App. 4th 861, 886-87 n.24 (1999) (applying balancing test in

26   commercial consumer context).

27        Here, Defendants' actions are "unfair" business practices.  Defendants denied Stackla

28   access to their platforms, suspended Stackla as an FMP, and assert that Stackla is in breach of the

1    MSA.  Defendants know that Stackla's business model depends on access to Facebook and

2    Instagram. The impact to Stackla is devastating; its entire business model and client prospects, as

3    well as its investor and employee relationships and its IPO, are being destroyed. Mahoney Decl.,

4    ¶ 2, 36-39. Defendants' purported justification—protection of user content—is pre-textual as

5    Stackla accesses content only through public sources and Facebook's authorized API.  *Id.*, ¶ 9-22.

6    Defendants have never hinted at any concrete harm that Stackla has caused to Defendants or their

7    users. *Id.*, ¶ 29.  Defendants have only vaguely complained about Stackla allegedly "scraping"

8    data from Instagram, but have shown no evidentiary support and Stackla strongly denies this

9    allegation. *Id.*  Instead, Defendants simply want to lock down access to public content on their

10   platforms that they do not own, limit its use for their own purposes, and deflect bad, inaccurate

11   publicity away from Instagram. *Id.*, ¶ 23-28.  Defendants' conduct also violates the UCL's

12   "unfair" prong.

13          Defendants' conduct also violates the "fraudulent" prong of the UCL because Defendants

14   promises of access by everyone to publicly shared or posted information are false and likely to

15   deceive users and businesses alike. *In re Tobacco II Cases*, 46 Cal. 4th 298, 312 (2009)

16   ("fraudulent" business practice under the UCL is one where users of the public are likely to be

17   deceived).  Here, Defendants' terms of use promise their users that only the users own their

18   content and control their privacy settings, while Defendants hold only non-exclusive licenses to

19   the content.  In addition, Defendants developed and operate the Facebook API to allow third party

20   application developers like Stackla to access public content of Defendants' users.  Defendants

21   also vetted Stackla's business model and application through the FMP program, including

22   requiring Stackla to demonstrate that its clients spend significant advertising revenue on

23   Facebook and Instagram, to be approved as an official FMP.  Again, Defendants made clear

24   promises to Stackla and other third party application developers and FMPs that they would have

25   access to users' public content through the API and could acquire the rights to user content.

26   Instead, Defendants are controlling who can access user content and whether the information will

27   be public. These statements are false, likely to deceive the public, and violate the "fraudulent"

28   prong of the UCL.

1

> *3.        Stackla is Likely to Prevail on its Breach of Contract and Breach of the Implied Covenant Claims*

2

3      Under California law, a claim for breach of contract must show: (1) the existence of a

4  contract; (2) plaintiff's performance or excuse for non-performance; (3) defendant's breach; and

5  (4) damages to plaintiff therefrom. *Acoustics, Inc. v. Trepte Constr. Co.*, 14 Cal. App. 3d 887, 913

6  (Cal. Ct. App. 1971).  Similarly, a claim for breach of the implied covenant of good faith and fair

7  dealing must show "(1) the parties entered into a contract; (2) the plaintiff fulfilled his obligations

8  under the contract; (3) any conditions precedent to the defendant's performance occurred; (4) the

9  defendant unfairly interfered with the plaintiff's rights to receive the benefits of the contract; and

10 (5) the plaintiff was harmed by the defendant's conduct." *In re Yahoo! Inc. Customer Data Sec.*

11 *Breach Litig.*, No. 16-MD-02752-LHK, 2017 WL 3727318, at *48 (N.D. Cal. Aug. 30, 2017).

12 Because Defendants' actions satisfy each element of both claims, Stackla is entitled to a TRO

13 enjoining Defendants from restricting Stackla's access to Defendants' platforms. *See Colonial*

14 *Life & Accident Ins. Co. v. Stentorians-L.A. Cnty. Blackfire*, 13-CV-9235-CAS, 2013 WL

15 6732687, at *3-4 (C.D. Cal. Dec. 19, 2013) (granting TRO based on breach of contract claim);

16 *Brinker v. JP Morgan Chase, N.A.*, No. 13-CV-01344-LHK, 2013 WL 7798675, at *2-3 (N.D.

17 Cal. May 17, 2013) (granting TRO based on breach of implied covenant of good faith and fair

18 dealing claim).

19      Defendants' breaches of contract and the implied covenant arise from several agreements.

20 First, Defendants and Stackla US entered into a Master Subscription Agreement on June 1, 2018,

21 which requires Defendants to provide access to their platforms so Stackla US can perform the

22 agreed upon services.  This MSA states that a party may terminate the agreement only if the other

23 party fails to cure any material breach within thirty days after written notice of such breach. Yet,

24 on August 30, 2019, Facebook cited to the MSA as the basis for depriving not just Stackla US but

25 all the Stackla entities of access to Defendants' platforms.  Defendants failed to providing Stackla

26 US any prior written notice of any alleged material breach or the contractually-mandated 30 days

27 to cure. Mahoney Decl., ¶ 29-32. Accordingly, Defendants' actions breach the MSA.  Second,

28 this conduct and Defendants' termination of access to its platforms and user content for Stackla

1    also breach Defendants' agreements to provide access through the Open Graph API for Stackla

2    and other third party application developers and their approval of Stackla to access the platforms

3    after vetting and approving Stackla as an official FMP.  Moreover, Defendants know from this

4    vetting process that Stackla's entire business is predicated on access to Facebook and Instagram,

5    and in depriving Stackla of such access, Defendants are both breaching their agreements and

6    depriving Stackla of the benefits of those agreements in violation of the implied covenant of good

7    faith and fair dealing.

8          Given Stackla's likelihood of success on its contract and implied covenant claims,

9    Defendants' breaches require a TRO and preliminary injunction forcing Defendants to reinstate

10   Stackla's access to the Facebook and Instagram platforms. Courts routinely grant relief

11   maintaining the contractual *status quo* in a breach of contract action while the matter is litigated.

12   *See, e.g.*, *Washington Capitols Basketball Club, Inc. v. Barry*, 304 F. Supp. 1193, 1196 (N.D. Cal.

13   1969); *Kaiser Trading Co. v. Associated Metals & Minerals Corp.*, 321 F. Supp. 923, 928 (N.D.

14   Cal. 1970). The same relief is appropriate here as the alternative is destruction of Stackla's

15   business.

16              4.      *Stackla is Likely to Prevail on its Promissory Estoppel Claim*

17          "The elements of promissory estoppel are (1) a clear promise, (2) reliance, (3) substantial

18   detriment, and (4) damages 'measured by the extent of the obligation assumed and not

19   performed.'" *See Toscano v. Greene Music*, 124 Cal. App. 4th 685, 692 (2004) (identifying

20   elements). Each element of promissory estoppel is satisfied here.

21          First, Defendants' promises are clear. "To be enforceable, a promise need only be

22   'definite enough that a court can determine the scope of the duty, and limits of performance must

23   be sufficiently defined to provide a rational basis for the assessment of damages.'" *Garcia v.

24   World Sav., FSB*, 183 Cal. App. 4th 1031, 1045 (2010) (internal citation omitted). Defendants

25   promised that their users that they own their content, choose the content they share, and that one

26   of the settings is "public," a setting that gives access to "anyone including people off of

27   Facebook." Tsai Decl., Ex. B; *see also id.*, Ex. C ("anyone will be able to see your profile [] on

28   the web"). These promises of the ability to publicly "connect with each other, build

1   communities," and "express [one]self" through "sharing status updates, photos, videos, and

2   stories" or "adding content" to one's profile are foundational to Defendants' success. Mahoney

3   Decl., Ex. A; *see also id.*, Ex. B ("Offering personalized opportunities to create, connect,

4   communicate, discover, and share.").

5          Second, Stackla reasonably relied on Defendants' express and implied assurances that

6   Stackla could access public content. Stackla's business model was disclosed to Defendants and

7   vetted through the FMP program and the Oculus RFP process.  Mahoney Decl., ¶¶ 17-22.

8   Defendants knew that Stackla's entire business model relies on access to Facebook and

9   Instagram, and approved Stackla's business model and application.  In fact, Defendants have

10  always allowed third party application developers access to their platforms' public content— the

11  Facebook API was built and offered to Stackla and others for this purpose. *Id.* ¶ 3, 5.  Defendants'

12  conduct was particularly unfair as to Stackla, because Defendants have not provided any

13  substantiated reasons for terminating Stackla's access.  Nor have Defendants evenly or

14  consistently applied their damaging actions to Stackla's competitors, who are still able to access

15  Defendants' platforms—except for other victims of Defendants chosen for extinction, like

16  Dialogue Consulting Pty Ltd.  *Id.*, ¶ 40, RJN Exs. A-B. Thus, Defendants are literally choosing

17  market winners and losers, likely for their own gain.  *Id.* ¶ 21, 25.

18         Third, Stackla's reliance on Defendants' promises was to its substantial detriment.  Based

19  on Defendants' API and the FMP, Stackla spent millions of dollars and thousands of hours

20  investing in its business predicated on Defendants' promise of access to public content on

21  Defendants' platforms. *Id.* ¶ 2.  If Stackla is not permitted access, its business will be destroyed.

22         Fourth, Stackla will suffer damages and insolvency as a direct result of Defendants'

23  conduct.  By denying Stackla access to Defendants' platforms, Defendants have caused

24  potentially irreparable damage to Stackla, including loss of its client contracts, loss of its investor

25  relationships and potential IPO, and probable insolvency.  *Id.* ¶ 2, 36-19. An immediate

26  injunction is necessary to prevent this damage from culminating in the destruction of Stackla's

27  business. "[I]njunctive relief is . . . a proper remedy for a claim based on promissory estoppel."

28  *Nicol v. Nelson*, 776 P.2d 1144, 1146 (Colo. App. 1989) (citing illustration from Restatement

1    Section 90); *Edmonds v. Los Angeles Cty.*, 40 Cal. 2d 642, 653 (1953) (approving Restatement

2    Section 90 and specifically enforcing property owner's promise to comply with grant of

3    nonconforming use to ordinance).

4              5.       *Stackla is Likely Entitled To Declaratory Judgment that It Has Not
                       Violated the CFAA or California Penal Code § 502(c)*
5

6            An actual controversy exists between Stackla and Facebook based on the Cease-and-

7    Desist Letter.  Courts may "declare the rights and other legal relations" of parties "[i]n a case of

8    actual controversy." 28 U.S.C. § 2201. "[T]he question in each case is whether the facts alleged,

9    under all circumstances, show that there is a substantial controversy, between parties having

10   adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a

11   declaratory judgment." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007) (internal

12   quotation marks and citations omitted). Issues raised in a "Cease-and-Desist Letter" are sufficient

13   to find "that there is a substantial controversy between the parties, that they have adverse

14   interests, and that the controversy is real and immediate." *TransFresh Corp. v. Ganzerla &*

15   *Assoc., Inc.*, 862 F. Supp. 2d 1009, 1021 (N.D. Cal. 2012).

16           As in *TransFresh*, the Cease-and-Desist Letter details why Stackla's continued access of

17   Defendants' platforms is allegedly illegal, and threatens Stackla with litigation if it continues

18   accessing to access the platforms. Stackla and Defendants thus have immediate adverse legal

19   interests that warrant a declaratory judgment. *MedImmune*, 549 U.S. at 127; *Transfresh*, 862 F.

20   Supp. 2d at 1021; *see also Cabell v. Zorro Prods., Inc.*, No. 5:15-CV-00771 (EJD), 2017 WL

21   2335597 at *9 (N.D. Cal. May 30, 2017) (actual controversy existed between parties in part

22   because defendant's actions prevented plaintiff from licensing a musical to other companies).

23                       a.       Defendants' claims would be brought for an improper purpose and
                                have an impermissible effect.
24

25           As detailed above, Defendants' revocation of Stackla's access to public content on their

26   platforms violates the parties' contracts as well as common law, and unfair competition law

27   principles. Any claim Defendants could otherwise legally bring against Stackla is therefore void

28   and without force, as it would be brought for an improper purpose and with an improper effect.

1    *Phillips v. Crown Central Petroleum Corp.*, 602 F.2d 616, 629 (4th Cir. 1979) ("A refusal to deal

2    [] right is limited to situations where the seller has not put together an arrangement in restraint of

3    trade."). Defendants' tactic of interpreting the CFAA so broadly as to allow a *per se* prohibition

4    of access to publicly available information on their platform would "turn a criminal hacking

5    statute into a 'sweeping Internet-policing mandate.'" *hiQ Labs, Inc. v. LinkedIn Corp.*, No. 17-

6    16783, 2019 WL 4251889, at *14 (9th Cir. Sept. 9, 2019) ("the rule of lenity favors our narrow

7    interpretation of the 'without authorization' provision in the CFAA").  The Ninth Circuit recently

8    rejected that interpretation holding that "when a computer network generally permits public

9    access to its data, a user's accessing that publicly available data will not constitute access without

10   authorization under the CFAA."  *Id.*

11                    b.      Stackla cannot be liable for violating the CFAA or California Penal
                              Code § 502(c).
12

13            Defendants' actions violate a number of contract, common law, and unfair competition

14   laws such that any claims Facebook might otherwise be permitted to bring are barred for their

15   improper purpose and effect.

16            First, the CFAA offers Defendants no recourse because the "CFAA's prohibition on

17   accessing a computer 'without authorization' is violated when a person circumvents a computer's

18   generally applicable rules regarding access permissions, such as username and password

19   requirements, to gain access to a computer [not] when a computer network generally permits

20   public access to its data" and a user "access[es] that publicly available data." *hiQ Labs, Inc. v.*

21   *LinkedIn Corp.*, No. 17-16783, 2019 WL 4251889, at *14 (9th Cir. Sept. 9, 2019). Like *HiQ*,

22   Stackla is only accessing "publicly available data" on Defendants' platforms; thus, Stackla is not

23   and cannot be in violation of the CFAA.

24            Similarly, Defendants' claim that Stackla allegedly violated Cal. Penal Code § 502(c)

25   would also fail.  To state a claim, Defendants would need to demonstrate Stackla's actions "were

26   undertaken by overcoming a technical barrier without the permission of" Defendants. *Synopsys,*

27   *Inc. v. Ubiquiti Networks, Inc*., 313 F. Supp. 3d 1056, 1074 (N.D. Cal. 2018). As explained

28   /////

1  above, Stackla's actions were vetted, approved, and permitted by Defendants. Mahoney Decl.,

2  ¶ 17-22.

3       **D.**    **An Injunction in Favor of Stackla is in the Public Interest**

4       The public interest weighs strongly in favor of issuing an injunction.  Preventing the

5  imminent destruction of Stackla's business and certain insolvency while the Court examines the

6  legal issues prevents the termination of Stackla's client contracts, preserves employee jobs and

7  investor relations, and will avoid deteriorate of the business to the point where it is not

8  salvageable. *Id.*, ¶ 2.  The public interest will be served by enjoining Defendants from committing

9  acts of unfair and unlawful competition. *See Max Factor & Co. v. Factor*, 226 F. Supp. 120, 126

10  (S.D. Cal. 1963) ("courts have consistently recognized the need to protect the public interest in

11  suits for … unfair competition"); *Metro-Goldwyn-Mayer, Inc. v. Lee*, 212 Cal. App. 2d 23, 28

12  (1963) (statute permitting injunction against acts of unfair competition "recognizes … the public

13  interest in protection against unfair business practices.").

14       **E.**    **No Bond Should Issue**

15       No bond should be required by Stackla.  Where no damage will result from a temporary

16  restraining order or preliminary injunction, no bond is necessary. *Jorgenson v. Cassiday*, 320

17  F.3d 906, 919 (9th Cir. 2003) ("The district court may dispense with the filing of a bond when it

18  concludes there is no realistic likelihood of harm to the defendant from enjoining his or her

19  conduct."). Stackla seeks to prevent Defendants from denying Stackla access to public content on

20  Defendants' platforms that Defendants formerly allowed.  Defendants vetted Stackla's business

21  model and application extensively for the FMP program, including an in-application review as

22  recently as May 2019.  Defendants have not identified any actual harm that would result from

23  restoring Stackla's access to their platforms. Thus, no bond is necessary or should be required.

24  **V.**    <u>**CONCLUSION**</u>

25       For the foregoing reasons, the Court should issue a temporary restraining order and an

26  order to show cause why a preliminary injunction should not be granted.  If such relief is not

27  granted on an emergency basis, Stackla's business will be irreparably destroyed.

28  /////

1   Dated:  September 19, 2019          FOR PLAINTIFFS STACKLA, INC., STACKLA
2                                       LTD., and STACKLA PTY LTD.

3
                                        By: /s/ *Isabelle L. Ord*
4                                           Jeffrey E. Tsai
                                            Isabelle L. Ord
5                                           David F. Gross
                                            Anthony L. Portelli
6                                           DLA PIPER LLP (US)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28