1   SONAL N. MEHTA (SBN 222086)
    sonal.mehta@wilmerhale.com
2   KEVIN J. O'BRIEN (SBN 278823)
    kevin.obrien@wilmerhale.com
3   WILMER CUTLER PICKERING HALE AND DORR LLP
    950 Page Mill Road
4   Palo Alto, CA 94304
    Tel:  650 858 6000
5   Fax:  650 858 6100

6   MATTHEW BENEDETTO (SBN 252379)
    matthew.benedetto@wilmerhale.com
7   WILMER CUTLER PICKERING HALE AND DORR LLP
    350 South Grand Avenue, Suite 2100
8   Los Angeles, CA 90071
    Tel: (213) 443-5300
9   Fax: (213) 443-5400

10  ARI HOLTZBLATT (*pro hac vice* pending)
    ari.holtzblatt@wilmerhale.com
11  WILMER CUTLER PICKERING HALE AND DORR LLP
    1875 Pennsylvania Avenue NW
12  Washington, DC 20006
    Tel: (202) 663-6000
13  Fax  (202) 663-6363

14  Attorneys for Defendants
    FACEBOOK, INC. and INSTAGRAM, LLC
15

16                     **UNITED STATES DISTRICT COURT**

17                   **NORTHERN DISTRICT OF CALIFORNIA**

18                          **OAKLAND DIVISION**

19  STACKLA, INC., a Delaware Corporation,
    STACKLA, LTD., an English Limited Company,       Case No.  4:19-CV-05849-PJH
20  and STACKLA, PTY, an Australian Proprietary
    Limited Company                                  **DEFENDANTS' OPPOSITION TO**
21                                                   **PLAINTIFFS' *EX PARTE* MOTION**
                        Plaintiffs,                   **FOR TEMPORARY RESTRAINING**
22                                                   **ORDER AND ORDER TO SHOW**
                                                     **CAUSE RE PRELIMINARY**
23                                                   **INJUNCTION**
    FACEBOOK, INC.. a Delaware Corporation,
24  INSTAGRAM, LLC, a Delaware Limited Liability
    Company, and DOES 1-20                           Date:   September 25, 2019
25                                                   Time:  9:00 am
                        Defendants.                  Place:  Courtroom 3, 3rd Floor
26

27

28  ──────────────────────────────────────────────
    DEFENDANTS' OPPOSITION TO PLAINTIFFS' EX PARTE MOTION FOR TRO AND ORDER TO
                    SHOW CAUSE RE PRELIMINARY INJUNCTION

**TABLE OF CONTENTS**

Page

I.     INTRODUCTION ..................................................................................................1

II.    FACTUAL BACKGROUND ...............................................................................3

       A.     Facebook Has Adopted Policies That Govern Permissible Use Of Its
              Platforms ...................................................................................................3

       B.     Facebook Controls Access By Third-Party Developers To User Data.........................4

       C.     Stackla Violated Facebook Anti-Scraping Policies, Leading Facebook To
              Take Enforcement Action ..........................................................................5

III.   LEGAL STANDARDS ........................................................................................7

IV.    STACKLA HAS FAILED TO SHOW IRREPARABLE INJURY AND THE
       MOTION FOR A TRO SHOULD BE DENIED ON THAT BASIS ALONE .........................7

       A.     Stackla's Conclusory Assertions Of Irreparable Harm Are Inadequate As A
              Matter Of Law ............................................................................................8

       B.     Money Damages Are Adequate ................................................................10

       C.     Stackla Cannot Claim Irreparable Injury When It Chose To Predicate A
              Business Model On Violating Facebook's Policies...................................10

       D.     Stackla's Delay In Working With Facebook To Establish Compliance And In
              Seeking The Temporary Restraining Order Belies The Assertion That
              Emergency Relief Is Necessary ...............................................................11

V.     PLAINTIFFS CANNOT SHOW A LIKELIHOOD OF SUCCESS ON THE MERITS .........11

       A.     Stackla's Tortious Interference Claims Are Meritless.............................11

       B.     Plaintiffs' Unfair Competition Claims Are Meritless..............................15

       C.     Plaintiffs' Claims For Breach of Contract and Breach of the Implied
              Covenants Will Fail .................................................................................18

       D.     Plaintiffs Fail to Plead A Viable Promissory Estoppel Claim ..................20

       E.     Stackla Is Not Entitled To Any Preliminary Declaratory Judgment Regarding
              CFAA And California Penal Code § 502(c) .............................................22

VI.    THE BALANCE OF EQUITIES WEIGHS AGAINST EXTRAORDINARY RELIEF........23

VII.   THERE IS NO PUBLIC INTEREST IN FORCING A TECHNOLOGY COMPANY
       TO DO BUSINESS WITH A WEB SCRAPER........................................................24

VIII.  CONCLUSION..................................................................................................25

DEFENDANTS' OPPOSITION TO PLAINTIFFS' EX PARTE MOTION FOR TRO AND ORDER TO
SHOW CAUSE RE PRELIMINARY INJUNCTION

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4

*AboveGem, Inc. v. Organo Gold Management, Limited,*
5
    2019 WL 3859012 (N.D. Cal. Aug. 16, 2019) ............................................ *passim*

6

*Buxton v. Eagle Test Sys Inc.,*
    2010 WL 1240749 (N.D. Cal. Mar. 26, 2010)...................................................2, 13
7

*Caplan v. Fellheimer Eichen Braverman & Kaskey,*
8
    68 F.3d 828 (3rd Cir.1995) ....................................................................11

9

*Caribbean Marine Servs. Co. v. Baldrige,*
    844 F.2d 668 (9th Cir. 1988) ................................................................8, 9
10

11

*ConWest Res., Inc. v. Playtime Novelties, Inc.,*
    2006 WL 3346226 (N.D. Cal. Nov. 17, 2006) ....................................................10
12

*Cuviello v. City of Stockton,*
13
    2008 WL 4283260 (E.D. Cal. Sept. 16, 2008).....................................................22

14

*Dotster, Inc. v. Internet Corp. For Assigned Names & Numbers,*
    296 F. Supp. 2d 1159 (C.D. Cal. 2003) ....................................................11, 18, 24
15

16

*Facebook, Inc. v. Power Ventures, Inc.,*
    252 F. Supp. 3d 765 (N.D. Cal. 2017) ...................................................23
17

*Go Daddy Operating Co., LLC v. Ghaznavi,*
18
    2017 WL 6513418 (N.D. Cal. Dec. 20, 2017)....................................................11

19

*Goldie's Bookstore, Inc. v. Superior Court,*
    739 F.2d 466 (9th Cir. 1984) .................................................................10
20

21

*hiQ Labs, Inc. v. LinkedIn Corp.,*
    2019 WL 4251889 (9th Cir. Sept. 9, 2019) ........................................14, 15, 16, 23
22

*Horne v. Harley-Davidson, Inc.,*
23
    660 F. Supp. 2d 1152 (C.D. Cal. 2009) ..........................................................3, 21

24

*Hougue v. City of Holtville,*
    2008 WL 1925249 (S.D. Cal. Apr. 30, 2008).....................................................20
25

26

*Hynix Semiconductor Inc. v. Rambus Inc.,*
    441 F. Supp. 2d 1066 (N.D. Cal. 2006) .................................................................21

27

28

DEFENDANTS' OPPOSITION TO PLAINTIFFS' EX PARTE MOTION FOR TRO AND ORDER TO
SHOW CAUSE RE PRELIMINARY INJUNCTION

*International Medcom, Inc. v. S.E. International, Inc.*,
  2015 WL 7753267 (N.D. Cal. Dec. 12, 2015) ...............................................8, 9, 24

*Levitt v. Yelp! Inc.*,
  765 F.3d 1123 (9th Cir. 2014) ....................................................................2, 16

*Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*,
  571 F.3d 873 (9th Cir. 2009) ..............................................................................7

*Milman v. FCA U.S., LLC*,
  2019 WL 3334612 (C.D. Cal. Apr. 15, 2019) ....................................................15

*Munaf v. Geren*,
  553 U.S. 674 (2008)..............................................................................................7

*Nat'l Rural Telecommunications Co-op. v. DIRECTV, Inc.*,
  319 F. Supp. 2d 1059 (C.D. Cal. 2003) ....................................................15, 17

*Packaging Sys., Inc. v. PRC-Desoto Int'l, Inc.*,
  2017 WL 3013408 (C.D. Cal. July 14, 2017)......................................................14

*Park Village Apartment Tenants Ass'n v. Mortimer Howard Trust*,
  636 F.3d 1150 (9th Cir. 2011) ..............................................................................7

*Sampson v. Murray*,
  415 U.S. 61 (1974)..............................................................................................10

*Telephia Inc. v. Cuppy*,
  2005 WL 588441 (N.D. Cal. Mar. 11, 2005)......................................................10

*Watson Labs., Inc. v. Rhone-Poulenc Rorer, Inc.*,
  178 F. Supp. 2d 1099 (C.D. Cal. 2001) ..............................................................17

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008)...................................................................................................7

*In re Yahoo! Inc. Customer Data Sec. Breach Litig.*,
  2017 WL 3727318 (N.D. Cal. Aug. 30, 2017) ....................................................20

**State Cases**

*Careau & Co. v. Sec. Pac. Bus. Credit, Inc.*,
  222 Cal. App. 3d 1371, 272 Cal. Rptr. 387 (Ct. App. 1990)..............................20

*Carma Developers (Cal.), Inc. v. Marathon Dev. California, Inc.*,
  2 Cal. 4th 342, 826 P.2d 710 (1992)..................................................................20

*Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*,
  20 Cal. 4th 163 (1999) .......................................................................................15

DEFENDANTS' OPPOSITION TO PLAINTIFFS' EX PARTE MOTION FOR TRO AND ORDER TO
SHOW CAUSE RE PRELIMINARY INJUNCTION

*Citizens of Humanity, LLC v. Costco Wholesale Corp.*,
    171 Cal. App. 4th 1 (2009) ............................................................................12

*Fibreboard Paper Products. Corp. v. East Bay Union of Machinists, Local 1304, United*
    *Steelworkders of America, AFL-CIO*,
    227 Cal. App. 2d 675 (1964) .......................................................................19

*Klein v. Earth Elements, Inc.*,
    59 Cal. App. 4th 965 (1997) .........................................................................16

*Korea Supply Co. v. Lockheed Martin Corp.*,
    29 Cal. App. 4th 1134 (2003) .......................................................................14

*Landberg v. Landberg*,
    24 Cal. App. 3d 742 (1972) ..........................................................................20

*Quelimane Co. v. Stewart Title Guar. Co.*,
    19 Cal. 4th 26 (1998) .............................................................................12, 13

*S. Bay Chevrolet v. Gen. Motors Acceptance Corp.*,
    72 Cal. App. 4th 861 (1999) .........................................................................16

*Shoemaker v. Myers*,
    52 Cal. 3d 1 (1990) .....................................................................................14

**Statutes**

28 U.S.C § 2201(a) ............................................................................................22

California Business and Professions Code § 17200, *et seq.* ............................................15

California Penal Code § 502(c)............................................................................22

MSA § 8.3 ..............................................................................................12, 19

**Other Authorities**

11A Fed. Prac. & Proc. § 2947 (2d ed. 1995)..........................................................23

DEFENDANTS' OPPOSITION TO PLAINTIFFS' EX PARTE MOTION FOR TRO AND ORDER TO
SHOW CAUSE RE PRELIMINARY INJUNCTION

## I. INTRODUCTION

Plaintiffs Stackla, Inc., Stackla, Ltd. and Stackla, Pty. ("Stackla" or "Plaintiffs") ask the Court to **alter the status quo** and **issue a mandatory injunction** to force Defendants Facebook, Inc. and Instagram, LLC ("Facebook" or "Defendants") to provide Stackla with access to Facebook's user data and systems after Stackla was found to have engaged in the unauthorized collection of user data and abuse of Facebook's products and systems.  This is not relief that should be granted via a temporary restraining order on less than one week's notice.  It is no surprise that Stackla does not identify any case in which a court has granted such a request because doing so would set a dangerous precedent.

The core of Stackla's argument is that it has the immediate, unfettered right to access, collect, and distribute user data (in this case, user's Instagram posts) from Facebook's platforms—even where Stackla does not comply with the terms and policies that govern that access and to which it agreed as a condition for gaining that access in the first place.  Stackla's motion barely acknowledges, let alone addresses, the applicable terms or policies or how Stackla claims it complies with them or would comply with them going forward if its access were restored.  Nor does Stackla provide any good reason why it needs such relief now.  In the three-week period leading up to this so-called emergency, Stackla purported to engage cooperatively with Facebook to address questions about its practices.  Those discussions were ongoing, with Stackla promising to provide additional information about its technical systems to Facebook less than a week before this motion was filed.  But Stackla short-circuited the process by rushing into Court to ask the Court to sanction Stackla's automated collection of user data.

The implications of such a ruling would be significant.  It is common sense that Facebook should be able to enforce its own policies—including to revoke access to user data altogether for developers that fail to abide by Facebook's policies.  It is also common sense that developers that violate Facebook's policies cannot just show up on the courthouse steps and demand that their access be reinstated.  Stackla complains of the "impossible position" it finds itself in.  But Stackla's own practices created the situation for which it now seeks an extraordinary remedy from this Court.   And what of the impossible position that Facebook and other online companies would find themselves in if Stackla's motion were to be granted?  Virtually every effort to enforce terms and policies that protect user data could be met with a request for emergency relief in this courthouse (and others around the

DEFENDANTS' OPPOSITION TO PLAINTIFFS' EX PARTE MOTION FOR TRO AND ORDER TO
SHOW CAUSE RE PRELIMINARY INJUNCTION

country) as long as the individual or entity seeking access to user data could claim to be relying on that data for its business.

That the balance of hardships strongly disfavors a temporary restraining order is confirmed by Stackla's anemic showing on the irreparable injury prong.  Stackla claims that its business will be destroyed without a temporary restraining order.  ***But Stackla has not identified a single customer, business opportunity, or dollar lost.***  Nor has it produced a single email, letter, bank statement, cancelled contract, or other document that would support the suggestion that its customers are fleeing (or about to flee) in droves or explain how a company boasting millions in funding, A-list customers, and an imminent IPO can simultaneously claim to be on the verge of bankruptcy.  Instead, Stackla's showing on irreparable harm is limited to a few lines of conclusory attorney argument and six short paragraphs of generalized averments from the company's CEO utterly lacking in specificity or substantiation.  *See, e.g. AboveGem, Inc. v. Organo Gold Management, Limited*, 2019 WL 3859012, at *4-5 (N.D. Cal. Aug. 16, 2019).  Moreover, the core of Stackla's claim is that Facebook breached its contract—which can only be remedied, if Stackla can prove its allegations (which it cannot), with monetary damages.  *Telephia Inc. v. Cuppy*, 2005 WL 588441, at *3 (N.D. Cal. Mar. 11, 2005).  In any case, even if Stackla were able to show some sort of particularized injury (it has not), it made the decision to base its business on data collection in violation of Facebook's terms and policies (to which it agreed) and any purported harm from being held to them is self-inflicted.

If the Court were to even reach the question of likelihood of success on the merits (it need not), that factor would only confirm that emergency relief should be rejected.  Stackla fails to plead—let alone establish that it is likely to succeed in proving—facts supporting a legally-viable claim.  As one example, Stackla argues it is likely to succeed on the merits of a claim for intentional interference with prospective economic advantage but fails to plead basic elements of that claim—including the existence of "specific economic relationships with identifiable third parties, which defendants knew about and intentionally disrupted through a wrongful act."  *Buxton v. Eagle Test Sys Inc.*, 2010 WL 1240749, at *2 (N.D. Cal. Mar. 26, 2010).  As another example, Stackla passingly suggests that Facebook's conduct here was somehow anti-competitive but it alleges no facts to

suggest that Facebook competes with Stackla in any way.  *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1136-37 (9th Cir. 2014) (rejecting "very general allegation" of anti-competitiveness).  And as a third example, Stackla argues it is likely to win on a claim for promissory estoppel but fails to identify any "clear and well defined" promise, let alone one that is independent of the explicit contracts that govern the relationship between Stackla and Facebook—contracts that Stackla itself has violated.  *See, e.g., Barnes v. Yahoo!*, Inc., 570 F.3d 1096, 1108 (9th Cir. 2009); *Horne v. Harley-Davidson, Inc.*, 660 F. Supp. 2d 1152, 1163 (C.D. Cal. 2009).  A pleading that fails to allege even basic elements of the claims is not one on which a party can credibly ask for emergency relief.  The motion for temporary restraining order should be denied.

## II.    FACTUAL BACKGROUND

Facebook offers the Facebook and Instagram services that connect billions of users around the globe.  Facebook and Instagram earn revenue through selling advertisements.  Facebook also partners with third-party app developers and marketers through its Facebook and Instagram platforms.  Ghotra Decl. ¶¶ 2-3.  These platforms allow a developer to create its own applications that integrate with Facebook and Instagram by allowing the developer, with user permission, to access information on those platforms.  *Id.*; Fusz Decl. ¶ 2.

### A.    Facebook Has Adopted Policies That Govern Permissible Use Of Its Platforms

Any user of the Facebook or Instagram platforms must abide by the terms of service that govern each platform. Eisenberger Decl. ¶¶ 2-3.  These terms of service govern the conduct of both end-users with social media profiles and developers with apps.  Eisenberger Decl. ¶¶ 2-6.  In addition, developers who seek to become Facebook Marketing Partners certify that they will comply with "all Facebook policies," including terms of service and platform policies.  Eisenberger Decl. ¶¶ 2-6.

This case involves Facebook's rules against unauthorized automated collection of user data—also known as "web-scraping."  Eisenberger Decl. ¶¶ 7-14.  In particular, the Facebook Terms of Service disallow users, including developers and marketing partners, from "access[ing] or collect[ing] data from our Products using automated means (without our prior permission) or

attempt[ing] to access data that you do not have permission to access."  Eisenberger Decl. ¶ 3.  Likewise, Instagram's Terms of Use prohibit users of Instagram (including developers and Marketing Partners) from "creating accounts or collecting information in an automated way without our express permission." *Id.*

The anti-web-scraping policy is an important user data protection.  Eisenberger Decl. ¶¶ 7-11.  It protects a user's ability to control his or her data, for example, by converting a public posting to a private posting.  Eisenberger Decl. ¶¶ 10-11.  Otherwise, a user who chooses to change her privacy settings from public to private (or delete the content) may involuntarily have that choice undermined by a third-party that scraped the data off of Facebook or Instagram.  *Id.*  And once scraped, the third-party could potentially sell it or use it for improper purposes.  *Id.*  With dedicated resources, Facebook enforces its anti-scraping policy, including by employing technical means and pursuing remedies against parties in breach.  Eisenberger Decl. ¶ 12.

Web-scraping may also be malicious.  Eisenberger Decl. ¶ 12.  However, as a technical matter, it can be difficult to determine whether a web-scraper's purposes are malevolent or benign.  Eisenberger Decl. ¶ 13.  For this reason, Facebook takes enforcement action against any third-party who engages in web-scraping.  Eisenberger Decl. ¶ 14.  As Facebook tells its developers, Facebook may enforce violations of its terms and policies by "disabling your app, restricting you and your app's access to Instagram Platform, requiring that you delete data, terminating our agreements with you or any other action that we deem appropriate."  Eisenberger Decl. ¶ 5.

**B.  Facebook Controls Access By Third-Party Developers To User Data**

Third-party app developers access the Facebook and Instagram platforms through Facebook's Graph Application Programming Interface (or "Graph API").  Eisenberger Decl. ¶ 7; Fusz Decl. ¶ 2.  To use the Graph API, a third-party app must obtain a unique App ID and the third-party developer must open a developer account.  Fusz Decl. ¶ 3.  The Graph API allows developers to use their own applications to access the Graph API to query data, post new stories, manage ads, upload photos, or perform other tasks.  Fusz Decl. ¶ 2.  The Graph API includes rate limits on the number of requests a party can make to the platform.  Eisenberger Decl. ¶ 8; Clark Decl. ¶ 2.  And bound by the Facebook and Instagram terms and policies, a developer is prohibited from

DEFENDANTS' OPPOSITION TO PLAINTIFFS' EX PARTE MOTION FOR TRO AND ORDER TO
SHOW CAUSE RE PRELIMINARY INJUNCTION

automatically collecting any type of user data from the Facebook or Instagram platforms. Eisenberger Decl. ¶ 6.

Third-party developers who wish to use the Graph API to access user information other than basic profile information must go through an app review process.  Fusz Decl. ¶¶ 4-7.  Some developers may also apply to be a Marketing Partner.  Ghotra Decl. ¶¶ 2-3.  If approved, the Marketing Partner Program allows a developer to display a badge on their own website to signal they have special experience or expertise in a particular area within marketing specialties, including the Creative Platform Partners ("CPP") program.  Ghotra Decl. ¶ 3.

Facebook credentials a developer in the CPP program if they meet Facebook's requirements for offering a mobile experience and technology solutions for generating advertisements at scale. Ghotra Decl. ¶¶ 5-11.  A CPP-applicant is required, among other things, to have a qualified app; a sufficient number of advertisers using their services; sufficient generated revenue; and to provide case studies showing how Stackla's services had been used to develop creative content at scale. Ghotra Decl. ¶¶ 4-13.  Applicants also are required to comply with all applicable Facebook policies. Ghotra Decl. ¶ 12; Eisenberger Decl. ¶ 3-4. And an applicant is required to maintain password-protected accounts with Instagram, Facebook, and the Graph API.  Clark Decl. ¶¶ 1, 6.  This process, however, does not evaluate the technical details of an app or whether an applicant was accessing user content outside of the Graph API in breach of Facebook's terms or policies.  Ghotra Decl. ¶ 13.

C.     **Stackla Violated Facebook Anti-Scraping Policies, Leading Facebook To Take Enforcement Action**

Stackla is a marketing company that has been a Facebook developer since 2012.  After first applying in August, 2018, Stackla was accepted as a Marketing Partner in the Creative Platform Program on May 25, 2019.  Ghotra Decl. ¶ 13.

In May 2019, days before Facebook approved Stackla's application to be a Facebook Marketing Partner, Facebook received a tip from a third party that Stackla was improperly working around the user data restrictions on the Graph API and misleading advertisers about the same.  Clark Decl. ¶ 2.  Facebook began to investigate these allegations.  Clark Decl. ¶ 3.  However, the tip was not verified, and so did not impact Stackla's Marketing Partner application.  *Id.*  Three months later,

on August 23, 2019, Facebook learned from a Business Insider reporter that Stackla (and a few other companies) were reportedly misusing the personal data of Facebook and Instagram users through web-scraping.  Clark Decl. ¶ 4.  Facebook then escalated its investigation into Stackla.  Clark Decl. ¶¶ 5-7.  However, Facebook was not singling Stackla out or arbitrarily acting against Stackla.  Eisenberger Decl. ¶ 14.

As the Stackla investigation progressed, it revealed that Stackla was accessing and saving public Instagram posts at a rate of tens of thousands of posts per day.  Clark Decl. ¶¶ 6-7.  Facebook determined that these activities were occurring outside of authorized use of the Graph API.  *Id.*  As a technical matter, it is inconceivable that a company the size of Stackla—with only about 60 employees—could have accessed and saved tens of thousands of user posts on a daily basis without using automated web-scraping software.  *See* Clark Decl. ¶ 7.  And at least some of the scraping activity was happening through password-credentialed, logged-in Instagram user accounts.  Clark Decl. ¶ 6.  Facebook also determined that Stackla was improperly storing data accessed from Instagram.  Clark Decl. ¶ 8.  Consequently, Facebook initiated a process to enforce the terms of use and platform policies.  Clark Decl. ¶¶ 9-12.

With this evidence in hand, Facebook sent Stackla a Cease-and-Desist letter on August 30, 2019.  Mehta Decl., Ex. 1.  The Cease-and-Desist letter informed Stackla that it was in breach of the MSA, the Instagram Terms, and the Facebook Terms based on the automated web-scraping of user data.  *Id.*  Facebook demanded that Stackla stop web-scraping.  *Id.*  Facebook also revoked Stackla's license to access the Instagram and Facebook accounts, as well as the Graph API, and "debadged" Stackla as a Marketing Partner.  *Id.*  To remediate against further automated access by Stackla, Facebook also asked for "a complete detailed technical explanation" of how Stackla accessed and stored user data, including "any software code You have developed or used to interact with the Instagram website and/or services[.]" *Id.*

Responding on September 3, 2019, Stackla failed to provide Facebook any of the requested technical details.  Mehta Decl., Ex. 2.  Stackla never specifically denied without qualification that it used automated means to obtain Instagram user data.  *Id.*  Instead, Stackla denied breach and alleged that Facebook was in breach of the MSA for revoking access to its platforms without giving

1  Stackla 30 days to cure the breach. *Id.* Stackla demanded that Facebook reinstate its accounts and
2  access to the platforms. *Id.*

3  Facebook responded on September 6. Mehta Decl., Ex. 3. Facebook clarified that its
4  investigation revealed that Stackla was making tens of thousands of API "calls" (or requests) per
5  day to Instagram to obtain photos and other media without Facebook's permission and outside of
6  valid use of the Graph API. *Id.* While Stackla's right to cure the MSA breach still applied, Facebook
7  required a technical explanation of Stackla's activities before it would reinstate access. *Id.*

8  The correspondence between the parties continued in this vein, with Stackla denying breach,
9  but never explaining how it could be accessing tens of thousands of Instragram posts per day without
10 automation. Mehta Decl., Exhs. 4-7. While Stackla eventually promised to provide the technical
11 details, it never did, instead only providing a fact sheet that was silent on this critical technical issue
12 of automated access. Mehta. Exh. 6. On September 13, Facebook asked again for the technical
13 explanation it had been requesting for weeks—and which Facebook had repeatedly told Stackla was
14 necessary for Facebook to reinstate Stackla's access. Mehta Decl., Ex. 7. Instead of providing those
15 details, three days later—and nearly three weeks after its access had been revoked-—Stackla filed
16 the Complaint and request for a Temporary Restraining Order. *See* D.I. 1 (Compl.); D.I. 3 (Mem.).

17 **III.   LEGAL STANDARDS**

18 The Court is familiar with the standard for granting a temporary restraining order.
19 *AboveGEM, Inc. v. Organo Gold Mgmt., Ltd.*, No. 19-CV-04789-PJH, 2019 WL 3859012, at \*2
20 (N.D. Cal. Aug. 16, 2019). A temporary restraining order "is an extraordinary and drastic remedy,"
21 *Munaf v. Geren*, 553 U.S. 674, 689 (2008), and a district court should enter a temporary restraining
22 order only "upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def.*
23 *Council, Inc.*, 555 U.S. 7, 22 (2008). Mandatory injunctions are "particularly disfavored." *Park*
24 *Village Apartment Tenants Ass'n v. Mortimer Howard Trust*, 636 F.3d 1150, 1160 (9th Cir. 2011);
25 *see Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009).[1]

26 **IV.    STACKLA HAS FAILED TO SHOW IRREPARABLE INJURY AND THE**

27

28 [1]      Emphasis added and internal citations omitted throughout, unless otherwise noted.

- 7 -

1  **MOTION FOR A TRO SHOULD BE DENIED ON THAT BASIS ALONE**

2  **A.      Stackla's Conclusory Assertions Of Irreparable Harm Are Inadequate**

3  **As A Matter Of Law**

4  A showing of irreparable harm requires that a movant "*demonstrate* immediate threatened

5  injury" as a prerequisite to emergency injunction relief.  *AboveGem, Inc.*, 2019 WL 3859012, at \*4-

6  5 (conclusory declaration of executive with no supporting evidence insufficient to show irreparable

7  harm) (italics in original); *International Medcom, Inc. v. S.E. International, Inc.*, 2015 WL 7753267,

8  \*5 (N.D. Cal. Dec. 12, 2015) (same).  Conclusory statements of economic harm by executives and

9  other employees, without supportive financial statements or other evidence, fail to show economic

10  harm.  *Id.*; *see also Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988)

11  (reversing preliminary injunction where district court did not require plaintiff to show that alleged

12  economic losses were likely to occur or imminent).

13  Here, Stackla was required to provide particularized evidence of the economic harm that it

14  claims it will suffer if the Court does not force Facebook to do business with them.  Stackla instead

15  relies on the declaration of its CEO Mr. Mahoney.  *See* Plaintiffs' TRO Mem., D.I. 3 at 9-10

16  ("Mem."); D.I. 3-10 at ¶¶ 36-41.  Mr. Mahoney asserts that Stackla is utterly dependent on

17  integration with Facebook's platforms; without this integration, supposedly-essential revenue

18  streams will be shut-off, threatening Stackla's very existence.  *Id.* at ¶ 37.  But Stackla offers no

19  evidence to support its claims of irreparable harm.  It has not submitted a single financial document

20  as evidence of actual revenue streams or profits that will be at risk if the temporary restraining order

21  is denied, let alone showing that the vast majority of Stackla's revenues flow from access to

22  Facebook's platforms.  Nor has Stackla submitted projections showing anticipated revenues or

23  profits that may be lost in the future if the motion is denied.  This financial evidence is essential to

24  any forward-looking irreparable harm analysis and without it, Stackla cannot carry its burden.

25  Likewise, while Mr. Mahoney avers that Stackla has received over 100 notices from clients

26  claiming material breaches of agreements, Stackla fails to identify even a single customer who has

27  claimed a material breach and fails to provide any of these communications (or any document at all)

28  as evidence that it is at risk of losing customers.  D.I. 3-10 at ¶¶ 37-38.  Mr. Mahoney's assertions

- 8 -

that unidentified prospective clients are selecting competitors over Stackla are similarly devoid of any specifics or support. *Id.* at ¶ 38. Moreover, even if Stackla had been able to identify a lost customer or potential customer, it would be hard-pressed to establish a nexus between the lost business opportunity and revocation of its access to Facebook's platforms as opposed to lost goodwill after public reports called out Stackla's business practices.

Despite Stackla's dire prognostications about its future without access to Facebook's platforms, there is no direct evidence in the record on which the Court could base a conclusion that Stackla is existentially dependent on Facebook. Nor is there any corroborating evidence that the revocation of access will disrupt Stackla's ability to seek fundraising or "potentially destroy[] Stackla's value," as Mr. Mahoney suggests. D.I. 3-10 at ¶ 39. Indeed, while Mr. Mahoney speculates that the revocation of access will hinder fundraising or prevent it from seeking an IPO, Stackla has offered no evidence that it has taken any concrete steps toward an IPO or that the process has been suspended. D.I. 3-10 at ¶ 2.

With no corroborating evidence of irreparable harm, Stackla invites the Court to take Mr. Mahoney's word for it. But a finding of irreparable harm cannot rest on his word alone. Indeed, this Court denied a temporary restraining order just last month in the face of an indistinguishable evidentiary failure. *AboveGem,* 2019 WL 3859012, at *4-5. In *AboveGem,* the plaintiff alleged breach of contract and a violation of California Unfair Competition law and asked this Court to freeze the defendant's assets. *Id.* Asserting irreparable harm, the plaintiff relied on a declaration of a co-founder that it would be driven out of business if it could not recover the sought-after funds. *Id.* But there was no actual evidence of when this would occur, and the plaintiff failed to provide any of the underlying financial information necessary to demonstrate imminent, irreparable harm. *Id.* The temporary restraining order was denied for a failure to show irreparable harm. *Id.; see also Int'l Medcom, Inc. v. S.E. Int'l, Inc.,* 2015 WL 7753267, at *3, 5 (N.D. Cal. Dec. 2, 2015) (CEO averments that defendant was "killing [plaintiff's] business in the short term, as well as irreparably harming the [plaintiff's] brand in the long term" and that "[plaintiff] will not be able to survive" in "a matter of weeks and months, not years," and describing financial troubles without support, too conclusory to show irreparable harm); *Caribbean Marine Servs. Co. v. Baldrige,* 844 F.2d 668, 674

1    (9th Cir. 1988) (declaration that conduct "may be costly" were not sufficient "to establish an

2    imminent threat of economic injury").

3          Ultimately, these authorities confirm the common-sense point that a party cannot establish

4    irreparable injury justifying extraordinary emergency relief based on the self-serving say-so of an

5    executive or employee.  Stackla's failure to make ***any*** particularized showing of irreparable injury

6    is fatal to its motion.

7                    **B.      Money Damages Are Adequate**

8          Even if Stackla's unsupported assertions of financial loss were to be accepted (they should

9    not be), mere financial injury "will not constitute irreparable harm if adequate compensatory relief

10   will be available in the course of litigation."  *Goldie's Bookstore, Inc. v. Superior Court*, 739 F.2d

11   466, 471 (9th Cir. 1984) (concluding that plaintiff's harm would be easily calculable in damages);

12   *see also Sampson v. Murray*, 415 U.S. 61, 90 (1974) ("The possibility that adequate compensatory

13   or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs

14   heavily against a claim of irreparable harm.").  For these reasons, injunctive relief is rarely granted

15   where, as here, the dispute sounds in contract.  Although Stackla has dressed its allegations up as a

16   variety of purported state and federal claims, the gravamen of the claim is its allegation that

17   Facebook breached its contractual obligations to Stackla by revoking Stackla's privileges to use

18   Facebook's platforms and API.  And under California state law, compensation for that contract

19   claim is money damages, not injunctive relief.  *See Telephia Inc. v. Cuppy*, 2005 WL 588441, at *3

20   (N.D. Cal. Mar. 11, 2005) ("[A] claim for breach of contract can be compensated by money

21   damages, and does not warrant the issuance of a preliminary injunction."); *ConWest Res., Inc. v.*

22   *Playtime Novelties, Inc.*, 2006 WL 3346226, at *8 (N.D. Cal. Nov. 17, 2006) ("[A] preliminary

23   injunction will not issue based on a breach of contract claim.").  And, should Stackla ultimately

24   prevail on its claims, there is no credible dispute that Facebook is good for the money.

25               **C.      Stackla Cannot Claim Irreparable Injury When It Chose To Predicate**

26                    **A Business Model On Violating Facebook's Policies**

27         Even if Stackla had made a particularized showing of imminent injury not compensable

28   through monetary damages (it has not), Stackla should not be able to claim irreparable harm based

- 10 -

on its own decision to build a business on violating Facebook's agreements and policies.  *Dotster, Inc. v. Internet Corp. For Assigned Names & Numbers*, 296 F. Supp. 2d 1159, 1163 (C.D. Cal. 2003).  If Stackla's founders and investors indeed predicated its business model on having perennial, unfettered access to Facebook's user data even in violation of Facebook's terms and policies, that was a risk assumed by Stackla.  *Id.*; *see also Caplan v. Fellheimer Eichen Braverman & Kaskey*, 68 F.3d 828, 839 (3rd Cir.1995) (citing 11A Fed. Prac. & Proc. § 2947 (2d ed. 1995)) ("If the harm complained of is self-inflicted, it does not qualify as Irreparable."))  Third-party developers are granted free (i.e., no monetary cost) access to Facebook's platform and API, which in turn gives them access to user data that is entrusted to Facebook.  *See* Eisenberger Decl., Exh. C (Platform Policy) at 7.1 ("We don't guarantee that Platform will always be free.").

> **D.     Stackla's Delay In Working With Facebook To Establish Compliance And In Seeking The Temporary Restraining Order Belies The Assertion That Emergency Relief Is Necessary**

As explained above, Facebook first notified Stackla that its access to the Facebook platforms was being revoked on August 30, 2019.  Between August 30, 2019 and September 16, 2019, Stackla's and Facebook's counsel exchanged multiple letters and emails on the subject, with Stackla saying it intended to provide technical information Facebook had requested.  Stackla still has not provided that information.  Instead, three weeks after its access was revoked, Stackla filed this request for a temporary restraining order.  Stackla's delay in seeking emergency relief negates a finding of irreparable harm.  *See Go Daddy Operating Co., LLC v. Ghaznavi*, 2017 WL 6513418, at *2 (N.D. Cal.  Dec. 20, 2017) ("GoDaddy's delay in filing the motion, while not extreme, does tend to negate the possibility of any immediate threat of irreparable harm.").  So too does its delay in providing the technical information that would have allowed Facebook to try to work with Stackla establish compliance and reinstate it.

## V.     PLAINTIFFS CANNOT SHOW A LIKELIHOOD OF SUCCESS ON THE MERITS

As explained in detail below, Plaintiffs have not asserted viable causes of action and therefore do not (and cannot) meet their burden to prove a likelihood of success on the merits.

> **A.     Stackla's Tortious Interference Claims Are Meritless**

1    Stackla's lead claims—for tortious interference with contract and prospective economic

2    advantage—fail for multiple reasons.  *See* Mem. 11-13; Compl. Counts Three & Four.

3    ***First***, Facebook acted with a "legitimate business purpose which justified its actions."

4    *Quelimane Co. v. Stewart Title Guar. Co.*, 19 Cal. 4th 26, 57 (1998) (recognizing defense to claim

5    for tortious interference with contract); *see also Citizens of Humanity, LLC v. Costco Wholesale

6    Corp.*, 171 Cal. App. 4th 1, 11-12 & n.7 (2009) (similar, for interference with economic advantage).

7    Most fundamentally, Facebook acted legitimately by enforcing the Instagram and Facebook terms

8    of service, to which Stackla had agreed as a third-party developer, Marketing Partner, and vendor

9    to Facebook.  There is no dispute that Stackla is bound by these terms.  Stackla also admits that, in

10   its role as a vendor, it "entered into" a Master Subscription Agreement ("MSA") with Facebook

11   (Compl. ¶ 115), and it attempts to assert its own claim for breach of that contract (*id.* ¶¶ 114-122;

12   Mem. 16-17).  And in section 8.3 of the MSA, Stackla represented that it would "comply at all times

13   with all Facebook policies," including those contained in the Instagram and Facebook terms.  Mehta

14   Decl. Exh. 9.  Stackla also certified that it would comply with all Facebook policies when applying

15   to be Facebook Marketing Partner. Eisenberger Decl. ¶ 6.

16   Stackla violated multiple provisions of its own contracts with Facebook.  Facebook's

17   investigation found that Stackla was using automated means to obtain user data, including through

18   the use of accounts that required a login to access Instagram, and was storing user data on its own

19   servers.  *See* Clark Decl. ¶¶ 6-12.  Facebook repeatedly invited Stackla to provide technical

20   information and evidence that would show otherwise.  *See* Mehta Decl. Ex. 1-7.  But rather than

21   provide that information, Stackla filed this lawsuit.  And here again, it has provided no evidence

22   disputing Facebook's findings that Stackla was using automation to access user data in violation of

23   the Facebook's terms and policies.  *See* Eisenberger Decl. ¶ 3.  Facebook's "privilege[] to prevent"

24   this "threat[]" to Facebook's own contracts forecloses both tortious interference claims.  *See

25   Richardson*, 98 Cal. App. 3d at 81.

26   Moreover, Facebook also acted legitimately to protect the privacy of its users.  Automated

27   data collection interferes with users' ability to control access to their own information, including by

28   deleting the content or changing their privacy setting from public to private.  Eisenberger Decl., ¶

- 12 -

10.  Facebook has invested in technological solutions and policy efforts to prevent developers from improperly obtaining, collecting, or using user data, including by automated collection.  *Id.* ¶ 14.  Facebook acted legitimately in safeguarding users' privacy in these ways.[2]

**Second**, Stackla has not met its burden to show that Facebook knew "interference [with Stackla's contracts] was *certain* or *substantially certain* to occur as a result" of enforcing its policies against automated access to user data.  *Quelimane*, 19 Cal. 4th at 56; *see also* Mem. 12.  Stackla asserts that Facebook acquired this knowledge when it "vetted" Stackla for the FMP program.  Mem. 5; *see also id.* at 12; D.I. 3-10 at ¶¶ 13-21.  But Mr. Mahoney does not say that Stackla ever told or otherwise informed Facebook that Stackla's services depended on violating the Facebook and Instagram Terms—whether during the FMP process or any other time.  *See* Mahoney Decl. ¶¶ 13-21.  And the Facebook employee who worked with Stackla during the FMP process has averred that this sort of technical information would not be part of the FMP process and that he has no memory of ever discussing it with Stackla.  *See* Ghotra Decl. ¶ 13.  Tellingly, when Stackla provided partial information about its data procedures, it claimed that the information was "confidential and proprietary trade secret information," Mehta Decl. Ex. 6—a position that cannot be squared with Stackla's theory that this information was already known to Facebook.  Stackla alone—and not Facebook—knew that it could apparently deliver promised services to its clients only by violating the Facebook and Instagram terms and policies.

**Third**, Stackla's claim for tortious interference with prospective economic advantage also fails because Stackla has not shown the existence of "*specific* economic relationships with *identifiable* third parties, which defendants knew about and intentionally disrupted through a wrongful act."  *Buxton*, 2010 WL 1240749, at *2.  Mr. Mahoney's declaration points, at most, to existing contracts with existing customers.  D.I. 3-10 at ¶ 9.  But a claim of tortious interference

---

[2]      For these same reasons, Stackla has failed to show that Facebook **intended** to disrupt Stackla's contracts, as Stackla's tortious interference claims require.  *See* Mem. 11-12.  If a "company is endeavoring to advance some interest of [its] own, the fact that [it] is aware that [it] will cause interference with the plaintiff's contract may be regarded as ***such a minor and incidental consequence and so far removed from the defendant's objective*** that … the interference may be found to be not improper."  *Quelimane Co.*, 19 Cal. 4th at 56.  Facebook acted to enforce its contracts and protect its users against web-scraping, not to interfere with Stackla's contracts.

with prospective economic relations will not lie for interference with existing contracts; the claim is available only for interference with **prospective** contractual relations—that is, those not yet reduced to contract. *See, e.g.*, *Shoemaker v. Myers*, 52 Cal. 3d 1, 24 (1990) (complaint identifying "no 'prospective economic advantage' other than continuation of [plaintiff's] employment relationship is, in reality, claim for inducement of breach of contract."). Stackla's failure to specifically identify any potential customers that Facebook knowingly impeded is fatal to its prospective interference claim. *See, e.g.*, *Packaging Sys., Inc. v. PRC-Desoto Int'l, Inc.*, 2017 WL 3013408, at *11 (C.D. Cal. July 14, 2017); *Westside Ctr. Assoc.* 42 Cal. App. 4th, at 528.

**Fourth**, Stackla's prospective interference claim also fails because Stackla has not shown that Facebook "engaged in an independently wrongful act," as that claim requires. *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. App. 4th 1134, 1158-1159 (2003). The three supposedly "wrongful acts" that Stackla points to overlap completely with its claims for breach of contract, promissory estoppel, and unfair competition. Mem. 12-13. The failure of these other claims thus also defeats Stackla's claim for tortious interference with economic advantage.

To the extent Stackla relies on *hiQ Labs, Inc. v. LinkedIn Corp.*, 2019 WL 4251889 (9th Cir. Sept. 9, 2019), to support its tortious interference claims, nothing in that decision excuses the defects set forth above. *HiQ* confirmed that "a legitimate business purpose can indeed justify interference with contract." *Id.* at *8. It then found that LinkedIn "may well not be able to demonstrate" such a purpose for reasons not present in this case. *Id.* at *10. Critically, the *hiQ* Court concluded that LinkedIn could claim no interest in enforcing its own contracts because its contractual relationship with hiQ had ended. *See id.* at *2 n.5, *9. Not so here, where Stackla is bound by Facebook's Terms and the MSA, and even asserts its (alleged) rights under the MSA in this litigation. The *hiQ* Court also emphasized that LinkedIn was apparently attempting to eliminate a direct competitor, casting doubt on the legitimacy of its actions and undermining any claim that it had been trying to protect user privacy. *hiQ Labs*, 2019 WL 4251889, at *9-10. Stackla, by contrast, is simply a company that sought to evade Facebook's publicly documented prohibitions against automated scraping and storing user information. It was not tortious interference for Facebook to enforce these

1    important contractual prohibitions.[3]

2              **B.      Plaintiffs' Unfair Competition Claims Are Meritless**

3           Stackla's claims that Facebook has engaged in unfair competition in violation of California

4    Business and Professions Code § 17200, *et seq.* (the "Unfair Competition Law" or "UCL") have no

5    basis in fact or law.  Stackla alleges that Facebook engaged in the three types of wrongful conduct

6    prohibited by the UCL—"unlawful" business acts or practice, "unfair" business acts or practice, and

7    "fraudulent" business acts or practice.  *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal.

8    4th 163, 180 (1999).    None of these theories has merit.

9           ***Unlawful Prong.***  Stackla alleges that Facebook's "disruption of Stackla's contractual and

10   prospective client relationships, its investor relationships and IPO, and its business as a whole are

11   unlawful" under the UCL.  Mem. 14.  "The 'unlawful' prong of the UCL proscribes 'anything that

12   can be [sic] be properly be called a business practice and that at the same time is forbidden by law.'"

13   *Nat'l Rural Telecommunications Co-op. v. DIRECTV, Inc.*, 319 F. Supp. 2d 1059, 1074 (C.D. Cal.

14   2003), *on reconsideration in part* (June 5, 2003).  But Stackla has not established that Facebook's

15   enforcement of its anti-scraping policies—itself a legitimate business practice—constitutes a

16   violation of any law.  *See, e.g.*, *Milman v. FCA U.S., LLC*, 2019 WL 3334612, at *8 (C.D. Cal. Apr.

17   15, 2019) (UCL's unlawful prong failed where all pled underlying crimes and torts failed).  Because

18   Stackla cannot establish a likelihood of prevailing on any of its business tort claims, this derivative

19   claim must also fail.  *See Nat'l Rural Telecommunications Co-op.*, 319 F. Supp. 2d at 1074 (UCL

20   claim premised on "unlawful" action cannot stand "independent of any law").

21          In its Complaint, but not its motion for a TRO, Stackla alleges without factual support that

22   Facebook's actions are unlawful under antitrust law and the "'essential facilities' doctrine, which

23   preclude[s] a monopolist or attempted monopolist from denying access to a facility it controls that

24   is essential to competitors."  Compl. ¶ 91.  But Stackla is a business ***partner*** of Facebook.  This case

25

26   ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
     [3]      *HiQ* also says nothing about the other defects in Stackla's tortious interference allegations
27   in this case.  *hiQ* did not involve any claim for tortious interference with economic advantage. And
     with respect to existing contracts, LinkedIn did not dispute that it knew its actions were certain to
28   disrupt hiQ's contracts.  *See* 2019 WL 4251889, at *7-8.

DEFENDANTS' OPPOSITION TO PLAINTIFFS' EX PARTE MOTION FOR TRO AND ORDER TO
SHOW CAUSE RE PRELIMINARY INJUNCTION

is thus nothing like *hiQ Labs*, in which evidence that LinkedIn was seeking to compete with the plaintiff in the market for data analytics caused the Court to doubt whether LinkedIn's conduct was "within the realm of fair competition."  No. 17-16783, 2019 WL 4251889, at *9 (9th Cir. Sept. 9, 2019).  Stackla alleges no facts to support the notion that Facebook sought to compete with it in any way; to the contrary, Stackla repeatedly invokes its marketing partnership with Facebook.  It makes no sense for Facebook to have wanted to do business with Stackla a few months ago only to want to then declare it a market "loser" now.  *See* Compl. ¶¶ 3, 30-36; Mem. 5-6.  Stackla cannot plausibly allege any antitrust injury.  *See, e.g.*, *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1136-37 (9th Cir. 2014) (rejecting "very general allegation" that defendant's conduct harmed competition).

**Unfair Prong.**  Stackla also asserts that Facebook's actions are unfair business practices because "Defendants denied Stackla access to their platforms, suspended Stackla as an FMP, and assert that Stackla is in breach of the MSA."  Mem. 14-15.  But Stackla cannot establish that a technology company's legitimate efforts to protect its users' data from automated scraping, in violation of its data policies, is "unfair" within the meaning of the UCL.

"The test of whether a business practice is unfair 'involves an examination of [that practice's] impact on its alleged victim, balanced against the reasons, justifications and motives of the alleged wrongdoer."  *S. Bay Chevrolet v. Gen. Motors Acceptance Corp.*, 72 Cal. App. 4th 861, 886 (1999).  "In general the 'unfairness' prong 'has been used to enjoin deceptive or sharp practices. ...'"  *Klein v. Earth Elements, Inc.*, 59 Cal. App. 4th 965, 970 (1997).

Here, Facebook's privacy-promoting actions to enforce the anti-scraping terms of its policies were neither "sharp" nor "unfair."  Their decision to remove Stackla's access to their platforms was justified by Stackla's violation of the Instagram terms.  There is no allegation that these prohibitions against web-scraping are unreasonable, nor could there be.  When Stackla violated these terms, Facebook was well within its rights to terminate its access.  *See S. Bay Chevrolet.*, 72 Cal. App. 4th at 887 (plaintiff failed to establish unfair business practice where contract term at issue was a "reasonable business practice," outweighing harm to plaintiff).  Furthermore, Facebook's reasons for terminating Stackla's access were not "vague[]" or without evidence.  Mem. 15.  Facebook provided Stackla with evidence that it was using automated methods to access user data—evidence

- 16 -

1   that Stackla has still failed to rebut.

2       *Fraudulent Prong.*   Stackla next alleges that Facebook's actions were "fraudulent"

3   "because Defendants' promises of access by everyone to publicly shared or posted information are

4   false and likely to deceive users and businesses alike."  Mem. 15.  This allegation has no merit.

5   Stackla conflates a user's permissible access to public information with impermissible automated

6   scraping of such information by a third-party developer in violation of Facebook's terms and

7   policies.  There can be no dispute that Facebook was entitled to enforce against such violations.

8       "A business practice is 'fraudulent' if 'members of the public are likely deceived.'" *Nat'l*

9   *Rural Telecommunications Co-op.*, 319 F. Supp. 2d at 1077.  Here, Stackla asserts that statements

10  Facebook made to developers regarding available data were deceptive and hid their actual intent.

11  Mem. 15.  This assertion strains credulity.  Facebook drafts, maintains, polices, and enforces its

12  robust terms and policies—which include prohibitions against automated data collection of user

13  data—specifically to control and limit third-party developer access to user data, which should be

14  obvious to any user of the platform especially a sophisticated company like Stackla.  *See* Eisenberger

15  Decl. ¶ 3.  It is simply not plausible for Stackla to allege that Facebook promised that Stackla could

16  violate Facebook's terms.  Nor is it plausible that any alleged "assurance" by Facebook that Stackla

17  "could access public content," Mem. 18, means that Facebook promised that Stackla could use

18  automated means to scrape user data in violation of Facebook's anti-scraping terms and policies.

19      To the extent Stackla means to claim that the terms of its contracts with Facebook were

20  "fraudulent," that alone is not actionable under the UCL.  *See, e.g.*, *Watson Labs., Inc. v. Rhone-*

21  *Poulenc Rorer, Inc.*, 178 F. Supp. 2d 1099, 1121 (C.D. Cal. 2001) ("[I]t is necessary under the

22  'fraudulent' prong [of the UCL] to show deception to some members of the public, or harm to the

23  public interest, and not merely to the direct competitor or other non-consumer party to a contract.").

24  Stackla has "not made a showing that the public was impacted at all by [Defendants'] alleged

25  actions" against Stackla, not least of which because enforcement of Facebook's terms is privacy-

26  promoting and in the public interest.  This claim is therefore unlikely to succeed on the merits.  *Nat'l*

27  *Rural Telecomms Co-op*, 319 F. Supp. 2d at 1078 (where plaintiffs could not show public was

28  impacted by allegedly fraudulent acts, claims under fraudulent prong failed as a matter of law).

DEFENDANTS' OPPOSITION TO PLAINTIFFS' EX PARTE MOTION FOR TRO AND ORDER TO
SHOW CAUSE RE PRELIMINARY INJUNCTION

C. **Plaintiffs' Claims For Breach of Contract and Breach of the Implied Covenants Will Fail**

"[T]he elements of a cause of action for breach of contract are (1) the existence of the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to the plaintiff." *AboveGEM, Inc.*, 2019 WL 3859012, at *3. Here, Plaintiffs assert three breach of contract theories:  (1) breach of the MSA; (2) breach of an alleged contract arising out of the Facebook Marketing Program; and (3) breach of the Implied Covenant of Good Faith and Fair Dealing.  Stackla's contract claims should be rejected.

*First*, Plaintiffs argue that they are likely to prevail on their contract-related claims because Facebook terminated their access to the Facebook and Instagram platforms in alleged violation of the MSA.  Facebook does not deny that Stackla's access to these platforms was terminated because Stackla violated Facebook's prohibition against automated data collection of user data.  But a claim that Facebook breached the MSA by enforcing its terms is not tenable.

The MSA governs the commercial relationship between Facebook and Stackla, in its role as a vendor to Facebook. The MSA is a contract for subscription of software services between Facebook and Stackla.  Mehta Decl, Ex. 9.  Plaintiffs contend that the MSA "requires Defendants to provide access to their platforms." Mem. 16.  But Stackla does not cite the MSA for this proposition because it cannot.  Only Stackla, as the "Vendor," made representations and warranties under the MSA, including that it would comply with the Facebook's policies.  *See* Mehta Decl, Ex. 8, § 8.3 (requiring that Stackla (the "Vendor") "comply at all times with all Facebook policies" including the terms of service of Facebook and its affiliates including Instagram).  On the other hand, the MSA has no requirement that Facebook must continue to provide Stackla with unfettered access to its platforms.  To the contrary, Section 14 expressly conditions any access on Stackla's compliance with "Facebook's policies, standards, and guidelines."  *Id.* § 14.1.

Because the plain language of the MSA makes clear that Stackla's access to the Facebook's platforms was contingent on their compliance with policies they were found to have violated, Stackla will not succeed on its breach of contract claim. *See Dotster, Inc. v. Internet Corp. For Assigned Names & Numbers*, 296 F. Supp. 2d 1159, 1165 (C.D. Cal. 2003) (citing to plain language

- 18 -

of the contract in rejecting plaintiffs' argument that contract could be read to impose an independent obligation on defendant).  If anything, the record supports a finding that it was Stackla, *not Facebook*, that breached the MSA.[4]  And Stackla's unclean hands are another basis to reject its request for equitable relief now.  *See, e.g., Fibreboard Paper Products. Corp. v. East Bay Union of Machinists, Local 1304, United Steelworkers of America, AFL-CIO*, 227 Cal. App. 2d 675, 727 (1964) ("one who violates his contract cannot have recourse to equity to support that violation.").

Beyond its backwards allegations that Facebook breached the MSA by revoking access to Facebook's platforms after Stackla failed to comply with its obligations, Stackla also alleges that Facebook breached the MSA because Facebook did not provide valid or timely notice of any breach and failed to give Stackla thirty days to cure any breach.  Compl. ¶ 118; Mem. 16-17.  This claim is easily rejected.  Section 7.2 provides that either party may terminate the MSA if the other party fails to cure a material breach within thirty days after written notice of such breach. Mehta Decl, Ex. 9, § 7.2.  Facebook provided written notice to Stackla of its breach of Section 8.3 of the MSA in its August 30, 2019 Cease and Desist letter.  Mehta Decl, Ex. 1.  The thirty days have not expired and Facebook has not terminated the MSA; Facebook has revoked Stackla's access to the Facebook and Instagram platforms because Stackla was found to have violated their policies.  Plaintiffs are still able cure its breach of the MSA.  Facebook has repeatedly invited them to do so.

***Second,*** Stackla alleges that Facebook's approval of Stackla as an FMP created a contractual obligation that, in its view, required Facebook to provide Stackla with unfettered access to their platforms. Mem. 17.  This has no basis in law or fact.  That Facebook approved Stackla as an FMP does not mean that Stackla was excused from complying with the Facebook or Instagram Terms and policies.  Rather, a Marketing Partner must agree to comply with Facebook's Marketing Partner Program Policies, which expressly requires that the Marketing Partners comply with the Facebook and Instagram terms.  Ghotra Decl. ¶ 6; Eisenberger Decl. ¶ 6.

---

[4]      By submitting this response on the temporary restraining order, Facebook is not foregoing any and all applicable rights and remedies against Stackla.  Facebook intends to preserve all challenges to jurisdiction of this Court over some or all of Stackla's claims based on, e.g., the parties' agreements, and all affirmative claims against Stackla.

***Third***, Plaintiffs allege that Facebook breached the implied covenants of good faith and fair dealing allegedly imposed through the MSA and the FMP program.  To establish a breach of the covenant of good faith and fair dealing, a plaintiff must show: "(1) the parties entered into a contract; (2) the plaintiff fulfilled his obligations under the contract; (3) any conditions precedent to the defendant's performance occurred; (4) the defendant unfairly interfered with the plaintiff's rights to receive the benefits of the contract; and (5) the plaintiff was harmed by the defendant's conduct." *In re Yahoo! Inc. Customer Data Sec. Breach Litig.*, 2017 WL 3727318, at *48 (N.D. Cal. Aug. 30, 2017).  A plaintiff must allege something more than a mere breach of contract.  *Hougue v. City of Holtville*, 2008 WL 1925249, at *4 (S.D. Cal. Apr. 30, 2008) ("A breach of implied covenant of good faith and fair dealing involves something beyond breach of the contractual duty itself").  Stackla has not established a likelihood of success on the merits of this claim for several reasons.

At the outset, as explained above, Stackla violated the Facebook's terms when it engaged in improper automated data collection of Instagram data; Stackla therefore did not "fulfill" its obligations under the MSA.  In any case, Facebook did not unfairly interfere with or frustrate any applicable contract.  *See, supra,* 17-20.  Rather, in accordance with the explicit terms of its contracts with Stackla, Facebook terminated Stackla's access to its platforms because Stackla violated Instagram's Terms.  This is not "objectively unreasonable" conduct by Facebook.  *Carma Developers (Cal.), Inc. v. Marathon Dev. California, Inc.*, 2 Cal. 4th 342, 371, 826 P.2d 710, 726 (1992).  Finally, Stackla cannot bring an implied covenant claim on the same facts alleged in its breach of contract claims, without "something beyond" the breach itself and devoid of allegations of unreasonable conduct "which unfairly frustrates the agreed common purposes." *Careau & Co. v. Sec. Pac. Bus. Credit, Inc.*, 222 Cal. App. 3d 1371, 1393, 272 Cal. Rptr. 387, 398 (Ct. App. 1990).

### D.    Plaintiffs Fail to Plead A Viable Promissory Estoppel Claim

Plaintiffs' promissory estoppel claim is premised on their allegation that Facebook "assured" Stackla access to their platforms' public content.  Promissory estoppel is disfavored, in part because it involves the enforcement of a promise with no consideration.  *See, e.g.*, *Landberg v. Landberg*, 24 Cal. App. 3d 742, 758-59 (1972).  To establish this claim, Plaintiffs must show:  "(1) a promise clear and unambiguous in its terms; (2) reliance by the party to whom the promise is made; (3) [the]

reliance must be both reasonable and foreseeable; and (4) the party asserting the estoppel must be injured by his reliance." *Hynix Semiconductor Inc. v. Rambus Inc.*, 441 F. Supp. 2d 1066, 1074 (N.D. Cal. 2006). Plaintiffs do not satisfy the elements of a promissory estoppel claim, because, at a minimum, they do not establish that Facebook made the "unambiguous" promise at issue and therefore have not established a likelihood of success on the merits.

As an initial matter, a plaintiff's claim for promissory estoppel will not lie when there is an explicit contract governing the same subject matter, unless the party asserting it is claiming that the promise modifies the contract. *See Horne v. Harley-Davidson, Inc.*, 660 F. Supp. 2d 1152, 1163 (C.D. Cal. 2009). Here, and as explained above, Facebook has valid contracts with Stackla, including the MSA, which explicitly provides that Stackla must comply with Facebook's terms and policies, including the policy against automated data collection. Stackla's Complaint fails to identify any specific statements by Facebook that constitute the alleged promise, and thus falls far short of demonstrating that Facebook made a clear and definite promise to modify its terms and policies to permit Stackla's data scraping. Instead, the clear provisions in Facebook's terms and policies prohibiting automated data collection prove that Facebook did not make the sort of promise that Stackla would need to allege to have a viable promissory estoppel claim.

Plaintiffs assert that Facebook assured them that they would have access to the Facebook's "public content." Facebook purports to evidence this "promise" by referring to Instagram's user-facing Privacy Settings & Information webpage. These pages do not establish a "clear and unambiguous" promise by Facebook to Stackla. First, the information Facebook provides about its privacy settings and how they operate their platforms is not an "unambiguous promise" to a third-party developer like Stackla about whether and how it can access data on the platforms. Nor does this information constitute a "promise" to developers that they can access public content without the limitations imposed by prohibitions against web-scraping.

Second, basing a business model on access to Facebook and Instagram, Mem. 18, is not a license to engage in automated data collection. Stackla asserts that Facebook "approved Stackla's business model and application." Mem. 18. But Stackla does not allege a single fact to suggest that it ever disclosed to Facebook during the FMP approval process that it was engaging in automated

DEFENDANTS' OPPOSITION TO PLAINTIFFS' EX PARTE MOTION FOR TRO AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION

data collection in violation of the Facebook's policies.  The FMP approval process is directed to marketing partnerships and does not consider or validate technical aspects of how the app works or whether the company is otherwise violating Facebook's Terms.  Ghotra Decl. ¶ 11.  And even Facebook's app approval process, which is directed to reviewing the technical aspects of third-party developers, may not identify scraping or other improper uses outside the permissible uses disclosed by the developer during the vetting process.   Fusz Decl. ¶ 4-5.  In any case, allowing "third party application developers access to their platforms' public content," Mem. 18, is not an explicit or implicit agreement to permit scraping or other conduct that is explicitly forbidden.

### E.   Stackla Is Not Entitled To Any Preliminary Declaratory Judgment Regarding CFAA And California Penal Code § 502(c)

Stackla is not entitled to a temporary declaration that, by continuing to access the Facebook and Instagram platforms, it "did not and will not" violate the federal Computer Fraud and Abuse Act, 18 U.S.C. § 1030 ("CFAA") and the California Comprehensive Computer Data Access and Fraud Act, California Penal Code § 502(c) ("section 502(c)").  Dkt. 3-20, at 3 (Proposed TRO).

As an initial matter, Stackla's request for a temporary declaratory judgment is something this Court lacks authority to provide.  The Declaratory Judgment Act authorizes courts to declare the parties' rights in a "***final*** judgment."  28 U.S.C § 2201(a).  And if the requisite standards are met, this Court may issue a temporary restraining ***order*** or a preliminary ***injunction***.  But no law authorizes this Court to issue a temporary or preliminary ***declaration***.  *See Cuviello v. City of Stockton*, 2008 WL 4283260, at *3 (E.D. Cal. Sept. 16, 2008); *see also Breedlove v. Am.'s Servicing Co.*, 2010 WL 1338089, *1 n.1 (D. Ariz. Mar. 31, 2010) (declining to issue preliminary declaratory relief because "[d]eclaratory relief and preliminary injunctions are governed by different standards and are considered at different stages of litigation").

Even beyond that threshold defect, Stackla is wrong that there is anything "improper" or "impermissible" about Defendants enforcing their binding terms against Stackla to prevent it from scraping user data.  Mem. 19-20.  Stackla invokes the Ninth Circuit's recent decision in *hiQ Labs*, but far from endorsing scraping or excusing developers from complying with a platform's terms of service, the Ninth Circuit emphasized the wide range of remedies available to "victims of data

1  scraping" under state and federal law, including asserting claims for "breach of contract."  2019 WL

2  4251889, at *14.  The lesson of *HiQ*, then, is that online service providers, like Defendants, can and

3  should stand on their **contractual** rights to prevent precisely the sort of conduct at issue here.[5]

4  ## VI.  THE BALANCE OF EQUITIES WEIGHS AGAINST EXTRAORDINARY RELIEF

5  Stackla asserts that the balance of equities weighs in its favor because it purportedly faces

6  extinction if it is not permitted to web-scrape the Facebook's platforms and because "Facebook

7  alone is currently valued at approximately $140 billion."  TRO at 10.  Not so.

8  As a threshold matter, an actor with unclean hands has a weak claim to the equities.  Stackla

9  made the decision to violate Facebook's terms and policies, also in breach of the MSA, and thus

10  created the situation for which it now seeks an extraordinary remedy.  11A Wright, Miller & Kane,

11  *Federal Practice & Procedure*, § 2947 (2d Ed.1995) ("If the harm complained of is self-inflicted,

12  it does not qualify as irreparable.").  If Facebook does not enforce its terms designed to protect its

13  users and the privacy of their data, then other actors will view Facebook's acquiescence as an

14  invitation to do the same.  With the real threat of multiple malicious actors scraping and storing user

15  data away from Facebook and Instagram's servers, Facebook faces the risk of significant hardship.

16  *See Facebook, Inc. v. Power Ventures, Inc.*, 252 F. Supp. 3d 765, 784 (N.D. Cal. 2017), *aff'd*, 749

17  F. App'x 557 (9th Cir. 2019) (granting permanent injunction because balance of hardships weighed

18  in Facebook's favor when Power Ventures gained unauthorized access to Facebook's data even

19  though injunction threatened Power Ventures's livelihood).  Facebook takes the protection of the

20  user experience seriously and is committed to keeping Facebook a safe place for users to interact

21  and share information.  Facebook has developed its terms of service and platform policies to protect

22  their users and facilitate these goals.  And Facebook has invested in technological solutions and

23  policy efforts to prevent third parties, such as Stackla, from circumventing Facebook's user data

24  policies.  Eisenberger Decl. ¶ 14.

25

26  _____

[5]  As for *HiQ*'s holding regarding the application of the CFAA to so-called publicly available

27  data, the time to seek further review of that decision has not yet run.  It would thus be especially imprudent to "declare" the rights of the parties in this case under a decision that may well change.

28

DEFENDANTS' OPPOSITION TO PLAINTIFFS' EX PARTE MOTION FOR TRO AND ORDER TO
SHOW CAUSE RE PRELIMINARY INJUNCTION

Moreover, contrary to Stackla's assertion, the issuance of a restraining order in this case would not "retain the status quo;" it would alter it by forcing Facebook to allow a non-compliant developer back on its platforms.  And the negative effects of this alteration of the status quo would not be merely economic in nature.  Rather, the relief would jeopardize the goodwill and brand equity that Facebook has built, especially in view of recent privacy enhancements it has made to its platforms, because users could reasonably fear that their data was vulnerable to unregulated web-scraping.  *Dotster, Inc. v. Internet Corp. For Assigned Names & Numbers*, 296 F. Supp. 2d 1159, 1163–64 (C.D. Cal. 2003) ("[L]oss of goodwill and reputation are important considerations in determining the existence of irreparable injury.").

The harms to the Facebook are therefore significant and certain,[6] and outweigh the speculative harm that Stackla alleges—the extinction of its business, which is asserted without evidence—it will suffer in the absence of a restraining order.  *Int'l Medcom, Inc. v. S.E. Int'l, Inc.*, 2015 WL 7753267, at *6 (N.D. Cal. Dec. 2, 2015) ("Plaintiff has not shown that it will suffer irreparable injury if a preliminary injunction is not granted. Defendant, on the other hand, has been selling these products for twenty years and an injunction enjoining them from continuing to do so would cause substantial harm."); *see also Dotster, Inc. v. Internet Corp. For Assigned Names & Numbers*, 296 F. Supp. 2d 1159, 1164 (C.D. Cal. 2003).

## VII.   THERE IS NO PUBLIC INTEREST IN FORCING A TECHNOLOGY COMPANY TO DO BUSINESS WITH A WEB SCRAPER

Stackla asserts that the public has an interest in forcing Facebook to reinstate platform access to a third-party developer whom Facebook found to have engaged in impermissible data scraping.  There is no such public interest.[7]  Rather, the public interest is served more meaningfully by

---

[6]   Stackla suggests that, if the Court were to enter a temporary restraining order, it forego a bond.  While Facebook would be entitled to a bond in that circumstance, the reality is that it is difficult to know what the amount of such a bond should be—the harm to Facebook is real and concrete, but not one that can be quantified in dollars.  The real risk to Facebook from a temporary restraining order here is non-monetary.  That is why emergency relief should not be granted.

[7]   Stackla also asserts that the public has an interest in "enjoining" Facebok's acts in purported violation of the UCL.  Mem. 21.  To be sure, the public has an interest in proper enforcement of the UCL.  But Stackla has failed to show any plausible UCL violation here.

- 24 -
DEFENDANTS' OPPOSITION TO PLAINTIFFS' EX PARTE MOTION FOR TRO AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION

permitting the Facebook to take all necessary steps to protect user privacy, including by enforcing against violations of their Terms—to which all users and developers, such as Stackla, agree.  The particular policy violation at issue here, automated data collection, is particularly relevant to user privacy because, once data is scraped and stored away from Facebook's servers, neither the Facebook nor users of Facebook's platforms themselves are able to detect or control how that data is used, shared, manipulated, or modified.  *See* Eisenberger Decl., ¶¶ 10-11.   That Facebook is taking affirmative steps to enhance user privacy, including by enforcing against bad actors who engage in automated data collection, is no doubt in the public interest.

Granting Stackla's injunction would have the effect of second-guessing, through a federal civil action, the Facebook's careful exercise of their platform enforcement authority.   The ramifications for technology companies—and more importantly for their users—would be far-reaching and fundamentally at odds with the efforts that Facebook and other technology companies are taking every day to enhance protection for user data.

## VIII. CONCLUSION

The Court should deny the Plaintiffs' motion for a temporary restraining order.


Dated: September 23, 2019

WILMER CUTLER PICKERING HALE AND DORR LLP


By:   */s/ Sonal N. Mehta*
Sonal N. Mehta
Matthew Benedetto
Ari Holtzblatt
Kevin O'Brien

*Attorneys for Defendants*
*Facebook, Inc. and Instagram, LLC*