UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STACKLA, INC., et al., <br>     Plaintiffs, <br> v. <br> FACEBOOK INC., et al., <br>     Defendants. | Case No. 19-cv-05849-PJH <br><br> **ORDER DENYING MOTION FOR TEMPORARY RESTRAINING ODER** <br> Re: Dkt. No. 3 |

Plaintiffs Stackla, Inc., Stackla, Ltd., and Stackla Pty Ltd.'s (together, "Stackla") motion for a temporary restraining order came on for hearing before this court on September 25, 2019. Dkt. 3. Plaintiffs appeared through their counsel, Jeffrey Tsai and Isabelle Ord. Defendants Facebook Inc. and Instagram, LLC (together, "Facebook") appeared through their counsel, Sonal Mehta and Matthew Benedetto. Having read the papers filed by the parties and carefully considered their arguments and the relevant legal authority, and good cause appearing, the court hereby DENIES the motion, for the following reasons.

**BACKGROUND**

On September 19, 2019, Stackla filed the complaint originating this action against defendants. The complaint asserts nine causes of action: (1) Declaratory Judgment Under 22 U.S.C. § 2201, that Plaintiffs Have Not Violated the Computer Fraud and Abuse Act (18 U.S.C. § 1030); (2) Declaratory Judgment Under 22 U.S.C. § 2201, that Plaintiffs Have Not Violated Cal. Penal Code § 502(c); (3) Intentional Interference with Contract; (4) Intentional Interference with Prospective Economic Advantage; (5) Unfair Competition

(Cal. Bus. & Prof. Code §§ 17200, et seq.); (6) Promissory Estoppel; (7) Breach of Contract; (8) Breach of Contract; and (9) Breach of the Implied Covenant of Good Faith and Fair Dealing. Compl., Dkt. 1.

Stackla operates a software-as-a-service business and sells annual cloud software subscriptions to clients. Compl. ¶ 23. Its service helps clients find content published to social media platforms such as Facebook, Twitter, YouTube, and Instagram, gain approval to use the content, and then re-purpose it in their own advertising and marketing activities. Mahoney Decl. ¶ 5, Dkt. 3-10.

Facebook is a large social-media company and platform, and Instagram is itself a large social-media platform wholly owned by Facebook. Compl. ¶¶ 12–14.

Stackla formerly used the Facebook Open Graph Application Programming Interface ("API"), which is developed and offered by Facebook to certain third-party application developers to more easily access data hosted by Facebook. Stackla would use Facebook's API to identify content uploaded by Facebook users for its clients to use in their advertising materials.

Stackla argues that its business requires access to Facebook's platforms, because "virtually all of Stackla's clients are heavily and almost exclusively reliant on Facebook and Instagram content to derive value from Stackla's platform." Mot. at 3, Dkt. 3. Approximately 80 percent of the content collected by Stackla's clients comes from postings on Facebook and Instagram. Mahoney Decl. ¶ 13; Compl. ¶ 57.

On May 25, 2019, Facebook accepted Stackla into the Facebook Marketing Partner program, and Stackla was presented as an official partner of Facebook on May 29, 2019. Mahoney Decl. ¶ 19.

In 2015, The Guardian broke a now-famous story involving Cambridge Analytica's misuse of Facebook data. Tsai Decl., Dkt. 3-1, Ex. E. The Federal Trade Commission later opened an investigation into whether Facebook had violated a prior settlement relating to Facebook user protections. Id., Ex. G. Facebook has been under public scrutiny—including from federal regulators and Congress—relating to the sufficiency of

its practices to ensure that the data it has, and the social networking interactions undertaken on its systems, are properly policed and not abused.

Around August 7, 2019, Business Insider published an article asserting that Instagram had allowed a third-party advertising user to misuse the platform to advance advertising and/or third party consumer-tracking purposes. See Mahoney Decl. ¶ 24. A subsequent article named Stackla as an offending third-party advertiser. Mahoney Decl. ¶ 25. Stackla denies the truth of the article.

On August 30, 2019, Stackla received a "Cease and Desist Abuse of Facebook" letter from Facebook. Mahoney Decl. ¶ 29; Compl. ¶ 49. The letter stated, among other things, that Stackla had breached a Master Subscription Agreement between it and Facebook and that Stackla was suspended as a marketing partner. See Compl. ¶ 51. The letter informed Stackla that it was no longer permitted to access Facebook's or Instagram's computer systems. The same day, Stackla's access to Facebook's API was terminated. Mahoney Decl. ¶ 30. The Facebook and Instagram accounts of Stackla officers were also terminated, and a number of Stackla's current and former employees were also barred access. Id.

The parties have corresponded since August 30, but Facebook's denial of access to its systems remains in effect.

On September 19, 2019, plaintiffs filed this suit and the present motion for a temporary restraining order.

**DISCUSSION**

**A. Legal Standard**

Federal Rule of Civil Procedure 65 provides federal courts with the authority to issue temporary restraining orders and preliminary injunctions. Fed. R. Civ. P. 65(a)–(b). Generally, the purpose of a preliminary injunction is to preserve the status quo and the rights of the parties until a final judgment on the merits can be rendered (see U.S. Philips Corp. v. KBC Bank N.V., 590 F.3d 1091, 1094 (9th Cir. 2010)), while the purpose of a temporary restraining order is to preserve the status quo before a preliminary injunction

hearing may be held (see Granny Goose Foods, Inc. v. Bhd. of Teamsters and Auto Truck Drivers, 415 U.S. 423, 439 (1974)).

Requests for temporary restraining orders are governed by the same legal standards that govern the issuance of a preliminary injunction. See Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc., 240 F.3d 832, 839 n.7 (9th Cir. 2001).

An injunction is a matter of equitable discretion and is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 22 (2008); see also Munaf v. Geren, 553 U.S. 674, 689–90 (2008). A preliminary injunction "should not be granted unless the movant, by a clear showing, carries the burden of persuasion." Mazurek v. Armstrong, 520 U.S. 968, 972 (1997) (per curiam).

"A plaintiff seeking a preliminary injunction must establish that [1] he is likely to succeed on the merits, that [2] he is likely to suffer irreparable harm in the absence of preliminary relief, that [3] the balance of equities tips in his favor, and that [4] an injunction is in the public interest." Winter, 555 U.S. at 20.

Alternatively, "'serious questions going to the merits' and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two elements of the Winter test are also met." All. for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1132 (9th Cir. 2011). "That is, 'serious questions going to the merits' and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." Id. at 1135; see also Disney Enterprises, Inc. v. VidAngel, Inc., 869 F.3d 848, 856 (9th Cir. 2017).

**B.     Analysis**

Under the both the Winter and Alliance for the Wild Rockies tests, plaintiffs must demonstrate (1) they are likely to suffer irreparable harm in the absence of the requested relief, and (2) an injunction is in the public interest. Plaintiffs do not satisfy either of these requirements, so the motion for a temporary restraining order must be denied. Because

plaintiffs must satisfy each of the four factors, the court need not address the balance of hardships or whether plaintiffs have raised serious questions going to the merits. See All. for the Wild Rockies, 865 at 1223 ("Because a party seeking a preliminary injunction must satisfy all four factors under both the Winter and 'sliding scale' standards for injunctive relief, we need not address the remaining three factors.") (citation omitted); Disney Enterprises, Inc., 869 F.3d at 856 ("Likelihood of success on the merits 'is the most important' Winter factor; if a movant fails to meet this 'threshold inquiry,' the court need not consider the other factors").

### 1. Irreparable Harm

Plaintiffs argue they will be irreparably harmed absent an injunction because "Stackla's business will be irretrievably destroyed before any hearing can take place and any relief on the merits will be too late to save Stackla." Mot. at 9.

Although "[m]onetary damages are not usually sufficient to establish irreparable harm[,] . . . . [t]he threat of being driven out of business is sufficient to establish irreparable harm." Am. Passage Media Corp. v. Cass Commc'ns, Inc., 750 F.2d 1470, 1473–74 (9th Cir. 1985). "A plaintiff must do more than merely allege imminent harm sufficient to establish standing; a plaintiff must *demonstrate* immediate threatened injury as a prerequisite to preliminary injunctive relief." Caribbean Marine Servs. Co. v. Baldrige, 844 F.2d 668, 674 (9th Cir. 1988). "Speculative injury cannot be the basis for a finding of irreparable harm." In re Excel Innovations, Inc., 502 F.3d 1086, 1098 (9th Cir. 2007).

The court first notes that plaintiffs' motion seeks a temporary restraining order, the purpose of which is to address only harms caused by actions likely to occur between the time of its filing and a preliminary injunction hearing. For that reason, plaintiffs' argument that "relief on the merits will be too late" misses the mark. Arguments regarding harm plaintiffs are likely to suffer caused by conduct occurring after a preliminary injunction hearing and before a final judgment on the merits are cognizable on a motion for preliminary injunction.

5

Plaintiffs support their arguments of irreparable harm primarily with a declaration from Damien William Mahoney, the Chief Executive Officer, director, and shareholder of one of the plaintiff entities, Stackla Pty. Ltd.[1] Mahoney Decl. ¶ 1. The company he is CEO and director of, Stackla Pty. Ltd., is the parent company and sole owner of the other two plaintiff entities. Id. Mahoney elsewhere avers that he is also CEO of the other two plaintiff entities. Id. ¶¶ 1, 3.

Preliminarily, plaintiffs' allegations of imminent harms share a common fatal flaw in that they merely allege speculative harm—they do not sufficiently demonstrate that it is likely to occur. Mahoney's declaration—the sole source cited to support plaintiffs' arguments for irreparable harm—is too speculative to constitute a basis for the extraordinary relief plaintiffs seek.

Mahoney attests to four broad points supporting the imminent harm plaintiffs allegedly face.

First, he declares that "virtually all" of plaintiffs' clients "heavily" rely on Facebook's platforms when using Stackla's products. Mahoney Decl. ¶¶ 5 ("[t]he vast majority of the content Stackla relies on for its business, however, comes from Facebook and Instagram"), 15 ("virtually all of Stackla's clients are heavily and almost exclusively reliant on Facebook and Instagram content to derive value from Stackla's platform"), 36 ("Facebook and Instagram user content sourced through Stackla is over 80% of the content curated by Stackla's clients through Stackla's platform.").

Stackla has sufficiently established for purposes of this motion that much— although admittedly not all—of the work it conducted for clients prior to August 30, 2019 involved accessing Facebook's platforms.

Second, Mahoney declares that if Stackla is unable to access Facebook, its current clients will terminate their existing agreements. Mahoney Decl. ¶¶ 15 ("If Stackla

---

[1] The court declines to consider plaintiffs' untimely filings, submitted on the literal eve of the hearing, which were not permitted under the briefing schedule and for which leave to file was not sought. See Dkt. 15.

6

1 does not have access to Facebook and Instagram content, Stackla's clients will not use
2 Stackla."), 31 ("to date, Stackla has received over 100 notices from its clients claiming a
3 material breach of its agreement with our clients"), 36 ("[w]ithout injunctive relief, Stackla
4 cannot deliver contractually promised services to its clients and will be forced to terminate
5 its client agreements if Stackla's clients do not cancel the agreements first. As of the
6 date of this declaration, a majority of Stackla's customers have already raised their
7 concerns regarding lack of access and Stackla's breach. If Stackla is not able to cure the
8 breaches and alleviate concern, Stackla's customer contracts will be terminated."), 38
9 ("Among Stackla's clients, those who have not already given notice of material breaches
10 are asking what recourse they have to cancel contracts and receive refunds for license
11 fees.").

Stackla's strongest argument here would be that it is in material breach of contractual obligations as a result of Facebook's ban, and its clients have confirmed that they will imminently be rightfully withdrawing from their agreements, resulting in a loss of revenue and client relationships. But, even charitably construed, Stackla merely alleges those conclusions—it does not demonstrate them. For example, Stackla does not identify a single client that it will imminently lose (or even an exemplary client it has already lost), it does not submit a copy of any contract it will breach (or even identify any exemplary contractual term it will breach), and it does not identify any clients who will imminently give notice of material breach (or even an exemplary client of the 100 who have already given such notice). Moreover, the fact that customers have "raised . . . concerns" and "are asking what recourse they have" does not demonstrate a likelihood that they will cease paying Stackla under the terms of their contracts—much less that they will do so imminently. Stackla asks the court to accept as true an allegation that its inability to access Facebook's platform constitutes the material breach of numerous contracts, and then to speculate that clients expressing concern and asking about Facebook will imminently terminate their relationships with plaintiffs—all before a preliminary injunction hearing is held. Plaintiffs have not not demonstrated that these

7

events are likely to transpire.

Third, Mahoney declares that if Stackla is unable to access Facebook, it will lose prospective clients it would otherwise contract with. Id. ¶ 38 ("Prospective clients are now questioning their decision to select Stackla and instead choosing its competitors."). Although it is possible this is true, Stackla has failed to demonstrate its likelihood. Mahoney has not identified prospective customers who have withdrawn from ongoing sales activities. Moreover, Stackla merely alleges but does not demonstrate that Facebook's ban caused this alleged harm (rather than, for example, prior negative media attention), or that the injunctive relief it seeks would be effective in curing it.

Fourth, Mahoney declares that if Stackla is unable to access Facebook, it will "soon" cease to be a going concern. Id. ¶¶ 37 ("Stackla relies on receivables from its clients to fund its operations, which are dependent on customers using the Stackla platform to source and acquire content. . . . Without continued access to Facebook and Instagram, Stackla will be deprived of its revenue."), 38 ("Stackla is losing business every day in which access to Facebook and Instagram is shut off, and this will soon reach a tipping point where Stackla can no longer operate.").

Even if the court found that plaintiffs had adequately demonstrated the likelihood of the above harms, that Stackla will lose existing clients and fail to attract new clients due to Facebook's ban, Stackla's request for emergency relief would have to be denied because it has failed to demonstrate that those harms would lead to the <u>irreparable</u> harm it seeks to remedy—its destruction as a business.

Mahoney's averment that "this will soon reach a tipping point where Stackla can no longer operate" is inherently speculative, although it is the precise question at issue in plaintiffs' motion. Plaintiffs do not offer any indication about their financial strength or the likelihood that they will dissolve as going concerns at any particular point in time. This court cannot hinge a finding that Stackla faces the threat of being driven out of business, caused by conduct likely to occur prior to a preliminary injunction hearing, based on its CEO's estimate that the company will "soon reach a tipping point[.]" The extraordinary

8

relief of a pre-adjudicatory injunction demands more precision with respect to when irreparable harm will occur than "soon."  Such vague statements are insufficient evidence to show a threat of extinction.  Am. Passage Media Corp., 750 F.2d at 1474 (statements that a company has "sustained large losses" in the past and "forecast[s] large losses again" in the future "are insufficient evidence that [plaintiff] is threatened with extinction"); see also AboveGEM, Inc. v. Organo Gold Mgmt., Ltd., Case No. 19-cv-04789-PJH, 2019 WL 3859012, at *5 (N.D. Cal. Aug. 16, 2019) ("plaintiff does not offer any indication of when it would be driven out of business, or underlying financial information that would demonstrate imminent, irreparable harm"); Int'l Medcom, Inc. v. S.E. Int'l, Inc., Case No. 15-cv-03839-HSG, 2015 WL 7753267, at *5 (N.D. Cal. Dec. 2, 2015) (no irreparable harm where "the record does not contain non-conclusory evidence sufficient to establish that (1) [plaintiff's] survival is a matter of weeks or months, (2) [defendant] caused [plaintiff's] financial troubles, and (3) if Plaintiff is ultimately successful, compensatory damages and injunctive relief would be inadequate").

### 2. The Public's Interest

Plaintiffs argue that the public interest favors an injunction because one would prevent the imminent destruction of Stackla's business, preserve employee jobs, and generally allow Stackla to continue operating.  Additionally, they argue that the public interest will be served by enjoining defendants' wrongful conduct.  Defendants argue that the public has an interest in allowing Facebook to exclude those who act impermissibly on its platform and jeopardize user privacy by, in this instance, automating data collection and scraping content en masse.  Facebook argues that the public has an interest in allowing it latitude to enforce rules preventing abuse of its platform.

The court finds that the public's interest cautions against issuing injunctive relief at this time.

Plaintiffs' arguments that the public interest supports enjoining conduct that violates civil statutes is surely correct, but plaintiffs are seeking pre-adjudicative injunctive relief.  By the very nature of plaintiffs' request that this court issue the extraordinary

9

remedy of an injunction prior to a determination on the merits (and even prior to hearing this pre-adjudicatory injunctive question on a normal briefing schedule), plaintiffs' appeal to the public interest of enjoining statutory violations begs the question. Moreover, Winter requires that plaintiffs show their likelihood of success on the merits as a separate element, and the court declines plaintiffs' invitation to subsume the distinct element assessing the public's interest into plaintiffs' likelihood of success on the merits. If an argument that a plaintiff is likely prevail on the merits were enough to satisfy the public's interest in an injunction, the public's interest would be a superfluous element in the analysis.

On plaintiffs' request for emergency injunctive relief, the court assesses the public's interest given the facts before it on this very abbreviated briefing schedule. Declining injunctive relief at this stage might result in a final award for plaintiffs that is less than fully compensatory, because the business may be defunct due to events that occur between now and when a preliminary injunction might issue following a 35-day briefing schedule. Moreover, some (unspecified number) of plaintiffs' employees may lose their jobs due to events occurring in that time period.

Awarding injunctive relief at this stage would compel Facebook to permit a suspected abuser of its platform and its users' privacy to continue to access its platform and users' data for weeks longer, until a preliminary injunction motion could be resolved. Moreover, as precedent within Facebook's policy-setting organization and potentially with other courts, issuing an injunction at this stage could handicap Facebook's ability to decisively police its social-media platforms in the first instance. Facebook's enforcement activities would be compromised if judicial review were expected to precede rather than follow its enforcement actions.

Although the public certainly has some interest in avoiding the dissolution of companies and the accompanying loss of employment, Facebook's ability to decisively police the integrity of its platforms is without question a pressing public interest. In particular, the public has a strong interest in the integrity of Facebook's platforms,

10

Facebook's policing of those platforms for abuses, and Facebook's protection of its users' privacy. Congress's ample attention to such abuse is more than enough to demonstrate the importance of those interests to the public, as are Facebook's recent interactions with the FTC. See generally, Facebook: Transparency and Use of Consumer Data: Hearing Before the Committee on Energy and Commerce, House Of Representatives, 115th Cong. (2018); Plaintiff's Consent Motion for Entry of Stipulated Order for Civil Penalty, Monetary Judgment, and Injunctive Relief and Memorandum in Support at 2–3, United States v. Facebook, Inc., Case No. 19-cv-02184-TJK (D.D.C. July 25, 2019), Dkt. 4 (Facebook consenting to $5 billion civil penalty in action brought by FTC based on, inter alia, Facebook "[1] maintaining deceptive settings that misled users about how to protect their information from being shared by Facebook with third-party developers of apps . . . [2] promising to stop giving app developers access to the data of app users' Friends starting in 2014, when in fact many app developers continued to have such access past that date . . . [and 3] inconsistently enforcing its privacy policies against app developers who violated those policies").

For the foregoing reasons, the public's interest favors allowing Facebook's ban of allegedly-abusive entities from its platforms to remain in effect pending at least a motion for preliminary injunction.

## CONCLUSION

For the foregoing reasons, plaintiffs' motion for a temporary restraining order is DENIED. Plaintiffs may file a motion for a preliminary injunction by October 9, 2019, on the normal briefing schedule set out by this court's local rules and standing orders.

**IT IS SO ORDERED.**

Dated: September 27, 2019

/s/ Phyllis J. Hamilton
PHYLLIS J. HAMILTON
United States District Judge